JAS APARTMENTS, INC., Appellant,

v.

Mohamad Ali NAJI, et
al., Respondents.

No. SC 91523.

Supreme Court of Missouri,
En Banc.

Nov. 15, 2011.

Rehearing Denied Dec. 20, 2011.

**176**

Paul D. Sinclair, Miriam E.C. Bailey, Polsinelli Shughart PC, Kansas City, MO, for appellant.

Theresa Shean Hall, Manz Swanson & Mulhern PC, Kansas City, MO, for respondents.

ZEL M. FISCHER, Judge.

This is the second appeal by JAS Apartments, Inc. ("JAS") arising from a contract for the sale of real estate. In the first appeal, the court of appeals reversed the circuit court's judgment and remanded the case for further proceedings. The circuit court did not make the appropriate determinations of law consistent with the decision of the court of appeals in the first remand, and so this Court reverses the judgment and remands once again. This case has a complex history, but it all boils down to one issue: when the preliminary title commitment states that the spouse of the seller must join in the real estate transaction (to release the seller's spouse's marital interest and convey marketable title), does the spouse's failure to join constitute a breach of the contract? This Court holds that the language of the preliminary title commitment required the seller's spouse to join in the real estate transaction, and the failure to do so constituted a breach of the real estate contract.[1]

## Facts

In November 2002, Mohamad Ali Naji ("Naji") and his wife ("Wife"), residents of California, owned a 137–unit apartment building on Armour Boulevard in Kansas City, Missouri. The Najis had purchased the property in partnership with other individuals but subsequently had bought out the others. Naji's attorney caused the ownership of the property to be vested solely in Naji's name. The property was subject to a deed of trust securing a loan

---

1. Portions of the court of appeals opinion by Judge James M. Smart, Jr., are used without further attribution.

with the remaining principal balance in 2002 of approximately $500,000.

Naji engaged a broker to list the property for sale. After a year on the market, JAS, a Minnesota corporation, commenced negotiations through a broker working on its behalf, ultimately offering $3.5 million with a $350,000 carryback. The parties' brokers, apparently unassisted by legal counsel, used a standard form contract issued by the Kansas City Metropolitan Board of Realtors and added a few non-uniform provisions.

Naji accepted the offer and signed the agreement as an individual, without any recitation of his marital status and without informing his wife. He learned shortly thereafter that his wife did not want him to sell the property.[2] Nevertheless, Naji fully intended to be bound by the contract.

The contract provided for a closing date of February 11, 2003. The contract also provided:

8. Seller shall deliver and pay for an owner's ALTA[3] title Insurance policy Insuring marketable fee simple title in Buyer in the amount of the purchase price as of the time and date of recordation of Seller's General Warranty Deed, subject only to the Permitted Exceptions defined below. Seller shall, as soon as possible and not later than fifteen (15) days after the Effective Date of this Contract, cause to be furnished to Buyer a current commitment to issue the policy (the "Title Commitment"), issued through Chicago Title (the "Title Company"). Buyer shall have ten (10) days after receipt of this Title Commitment (the "Review Period") in which to notify Seller in writing of any objections Buyer has to any matters shown or referred to in the Title Commitment. Any matters which are set forth in the Title Commitment and to which Buyer does not object within the Review Period shall be deemed to be permitted exceptions to the status of Seller's title (the "Permitted Exceptions"). With regard to items to which Buyer does object within the Review Period, Seller shall have until Closing to cure the objections. If Seller does not cure the objections by closing, this contract shall automatically be terminated unless Buyer waives the objections on or before Closing.

Naji informed his broker that his wife would not sign any documents because she did not agree with his plan to sell the building. He indicated that he would continue trying to obtain her consent. He asked that the broker communicate his concerns to the buyer.

Naji secured a preliminary title commitment from the title company, Chicago Title, on January 8, 2003. The commitment provided that upon closing of the transaction and the recording of the deed, "the form and execution of which is satisfactory to [Chicago Title]," the policy "will be issued containing exceptions in Schedule B thereof to the following matters (unless the same are disposed of to the satisfaction of [Chicago Title] )."

Chicago Title, like most other title companies, uses forms of commitment suggested by ALTA. At the time of the transaction, Chicago Title listed both exceptions

---

**2.** Though the Najis resided in California, Wife liked the building's architectural appeal and the income the building produced. Naji regarded the $3.5 million offer as an exceptionally good offer in light of his previous efforts to market the property. She did not disagree that the contract price was a good price for the property. She just did not want him to sell it.

**3.** ALTA is an acronym for American Land Title Association.

178

and requirements on one schedule B.[4] The introductory paragraph of schedule B in this case stated as follows:

> Upon payment of the full consideration to, or for the account of, the grantors or mortgagors, and recording of the deeds and/or mortgages, the form and execution of which is satisfactory to the Company, the policy or policies will be issued containing exceptions in Schedule B thereof to the following matters (unless the same are disposed of to the satisfaction of the Company)[.][5]

Schedule B of the commitment then set forth 19 items. Pertinent to this appeal, item 15 stated: "The spouse, if any, of Mohamad Ali Naji must join in the proposed agreement." JAS did not object in writing to any of the 19 items in schedule B during the review period provided by the contract.

As the closing approached, Naji repeatedly sought Wife's consent to the transfer. Naji continued to hope to secure his wife's cooperation until late January 2003. In early February 2003, Naji was in contact with the Chicago Title closing officer, Bonnie Vestal ("Vestal"). He informed Vestal of Wife's determined unwillingness to agree to the transaction. He understood that JAS would not agree to close the transaction without the consent of his wife. Naji was concerned that the transaction would not close.

An attorney for JAS spoke with Vestal on February 7, four days before the proposed closing. They discussed the fact that Wife was still refusing to sign or approve the transaction, and Vestal stated that the transaction "would not close" without Wife's signature. On February 10, the day before the proposed closing, an attorney for JAS called Naji, who evidently was still not represented by legal counsel. Naji confirmed that his wife would not sign. The attorney threatened litigation if Naji could not secure Wife's consent. The next day, the attorney sent Naji a letter referring to the conversation, noting the damages that would result from a failure to close. Naji evidently did not respond.

JAS regarded the lack of consent from Wife as a default by Naji. Instead of appearing at closing, JAS sought to enforce the contract in circuit court by legally extinguishing Wife's interest. JAS tried to accomplish this by obtaining a declaration that the transfer would not be in fraud of her marital rights and obtaining an order of specific performance. JAS's lawsuit asked the circuit court to declare an extinguishment of Wife's interest so that Naji could convey marketable title and Chicago Title would insure marketable title (because JAS anticipated that it would overcome the statutory presumption that the proposed sale would be a fraud against the marital rights of Wife).

Naji secured legal representation and countered with his own counterclaim for breach of contract for JAS's refusal to close as scheduled. Naji claimed the contract language stated that any "matter" in the title commitment not objected to would become a "permitted exception." Naji argued that the contract gave JAS only a 10–day review period to object in writing to any "matter" affecting title shown on the

---

4.  Many other companies used separate schedules: a schedule B –1 (listing the "requirements" for closing), and a schedule B –2 (listing the items that the title company anticipates excepting from coverage). *See, e.g.,* BARLOW BURKE, LAW OF TITLE INSURANCE, app. 1 at

A –3 to –15 (1970 Owner's Policy and Lender's Policy) (3d ed.2011).

5.  The word "matters" appears in the introduction to schedule B in its efforts to refer to the exceptions listed there. *See, e.g.,* BURKE, app. 1 at A –13.

title commitment. Naji further argued that because JAS had not timely objected in writing to the title company's reference to the need for Wife's participation, JAS had effectively agreed to take title subject to any potential marital interest of Wife. Naji's position, in other words, was that JAS had defaulted by not closing, regardless of Wife's lack of consent.

### The First Circuit Court Ruling

After hearing evidence, the circuit court concluded that it was unable to grant specific performance and was unable to extinguish Wife's marital rights. The court said the claim was not ripe or justiciable because Wife had not yet asserted her claim of interest. The court also determined that JAS had not agreed to take title subject to Wife's interest. Accordingly, the court said, Naji's inability to secure Wife's consent to the agreement rendered Naji unable to deliver marketable title. The circuit court found that because Naji could not cure the impending title defect, the contract terminated. The circuit court denied relief to both parties. The circuit court said, in effect, that neither Naji nor JAS were in default. Both parties appealed.

### The First Appeal

The first appeal addressed the circuit court's determination that the contract terminated under its own terms. *JAS Apartments, Inc. v. Naji*, 230 S.W.3d 354, 358

(Mo.App.2007) ("*Naji I* "). The court of appeals disagreed with the circuit court's analysis, holding that the contract had not self-terminated. *Id.* at 358–59. The court of appeals noted that the contract would self-terminate only if two things occurred: first, there must have been some impending title defect in schedule B to which JAS was required to object in writing if it did not wish to take title subject to the defect; and second, Naji must have failed in being able to resolve the objection.[6] *Id.* at 358. As such, "[t]he contract remained in force, and the parties were obligated to perform their duties under it."[7] *Id.*

The court of appeals held that it could not rule whether Chicago Title had intended Wife's participation in the transaction to be an "exception" as opposed to a "requirement" for issuance of the insurance policy based on the record before it. The court noted that the location of the item in a schedule that purported to be listing "exceptions" indicated one thing, while the wording of the item specifying that Wife "must" sign indicated the opposite, creating an ambiguity. *Id.* at 362. The court of appeals further held that if "Chicago Title intended for the provision to be a requirement for issuance of a policy insuring the property's title . . . the circuit court may well deem Naji to be in breach of contract for failing to perform his obligations to cause Chicago Title to issue a policy insuring the property's title." *Id.* at 358 n. 3.

6. In fact, even the occurrence of these conditions did not self-terminate the contract but instead afforded JAS the right to declare the contract terminated or, in the alternative, to elect to waive the uncured objection and to close receiving title subject to the uncured objection.

7. The circuit court had reached a very practical result, if not a technically accurate result, in determining that the contract terminated "by its own terms." The circuit court

recognized that Naji could not convey title that Chicago Title would insure as "marketable." Because JAS did not wish to declare the contract breached and walk away with a refund of its down payment, the circuit court's solution was not acceptable to JAS. JAS wanted to acquire the property, and JAS had the right to bring its legal action to seek specific performance and to cancel Wife's marital interest.

The court of appeal's reasoning was grounded in an understanding of how title insurance functions in a conveyance. In preparing to issue a title commitment, a title company typically examines the matters of record that affect the title of the seller. The title company's research will discover matters affecting title including restrictions, easements, recorded leases, and various types of liens. The title company will consider many of the items discovered to be "exceptions" or "clouds on title" that the title company plans to exclude from title coverage unless the exception is resolved to the title company's satisfaction. Typically, exceptions are simply listed, without any accompanying instruction or direction.[8]

There are other items commonly identified in a title commitment as "requirements." Requirements are directions or instructions that must be completed as a condition of the title company's willingness to issue a title policy insuring marketable title in the buyer. Typically, requirements are written as a direction and instruct a specific action that must be taken.[9] Here, the court of appeals believed further evidence was required to determine whether item 15 would have typically appeared on a schedule B–1 as a requirement or a schedule B–2 as an exception because Chicago Title's title commitment combined exceptions and requirements.

The court of appeals expressly remanded "for the circuit court to consider whether or not Naji breached the agreement and, if so, what the appropriate remedy should be."[10] *Id.* at 359. The court of appeals noted that it found evidence that could support a finding that Naji anticipatorily repudiated the contract. *Id.* at 362. The court of appeals acknowledged that the contract did not require Wife to join in the transaction.[11] *Id.* The court of appeals pointed out, however, that the contract *did* require Naji to provide JAS a title policy "insuring marketable fee simple title subject to any exceptions in the title insurance to which JAS ... did not object." *Id.* This conclusion returned the court of appeals to its earlier observation that the circuit court needed to determine whether the directive that Wife join in the transaction was a "requirement" or an "exception." *Id.* If it was a "requirement," JAS did not need to timely object and Naji would be in anticipatory breach of the contract, given his indication that Wife would not consent

8. Exceptions are usually itemized on a schedule B–2 of a title commitment.

9. Requirements are usually itemized on a schedule B–1.

10. The court of appeals also granted JAS's point that the issue of whether Naji's sale of the property without Wife's consent would be in fraud of marital rights was ripe for adjudication and that JAS had standing to pursue a declaratory judgment. *Naji I*, 230 S.W.3d at 360–61. The court of appeals held that JAS would not otherwise have an adequate remedy at law. *Id.* The court of appeals noted that specific performance of the contract could be awarded even without Wife's participation, citing *Wilkinson v. Vaughn*, 419 S.W.2d 1 (Mo.1967), as long as the statutory presumption of fraud is found to be inapplicable. *Id.* at 362. The court of appeals specified that "upon remand, if the circuit court should determine that Naji's conveyance of the property did not [*i.e.*, would not] defraud his wife of her marital interests in the property, [the court] is free to order specific performance." *Id.*

11. It is obvious that the phrase "join in the agreement," in practical terms, would mean "consent and formally agree to the transaction." This might be evidenced by joining in the *deed* or by a separately executed consent to the conveyance and a release of her interest. Or it could have meant join "in the *contract*," which would have obligated Wife to release her marital interest in some fashion. The point was that Wife needed to release her marital interest.

to the transaction. *Id.* If it was an "exception," JAS waived any claim of breach by failing to timely object to the title defect and JAS would be in breach of the contract for refusing to close. *Id.* The court of appeals stated:

> **Resolution of the issue depends on the circuit court's factual finding of** *whether or not the title insurer intended the title insurance commitment to require [Wife's] joining in the contract or whether or not [Wife's] joining in the contract was an exception to the promised title insurance.* **Upon remand, the circuit court will resolve this issue.**

*Id.* (emphasis added).

### Remand Hearing

In accordance with the mandate, the parties on remand introduced more testimony and evidence as to the "exception versus requirement" issue. At the hearing conducted on remand, the circuit court considered testimony from the key witnesses, who had testified earlier before a different judge in the first trial. Included among the witnesses were John T. Coghlan and Kellee Dunn–Walters, who testified in the first trial as title insurance experts. In addition, the circuit court also heard testimony for the first time from Stephen M. Todd, who had served 33 years as regional counsel for Chicago Title and was so serving at the time of the pertinent events in 2003 (and continued until his retirement in 2006). Todd has served as chair of the Missouri Bar Property Law Committee, has authored the Missouri Foreclosure Manual, and has written the Missouri Handbook on Title Insurance. *See* Todd, Missouri Foreclosure Manual, 38 MISSOURI PRACTICE SERIES (2009–2010 ed.); and I Mo. REAL ESTATE PRACTICE Chapter 2, Title Insurance (MoBar 4th ed.2000).

Todd's testimony closely paralleled that previously given by Coghlan but also provided significant additional information. Todd explained the background as to schedule B and presented testimony not only as to "requirements" and "exceptions" but also as to custom and practice in the title insurance industry.

Coghlan also provided substantial experience, having previously worked a combined 18 years for Chicago Title and Stewart Title. Currently, as a practitioner, he represents the Missouri Title Insurance Association (affiliated with ALTA) and title companies in his law practice.

Dunn–Walters had worked for Chicago Title since 2000. She had several years of previous experience as a title examiner (for Asbury Title) and had since served as an underwriting counsel and commercial manager with Chicago Title.

### The Ruling After Remand

After hearing the evidence, the circuit court on remand stated:

> According to the court of appeals, this decision [as to the issue of whether Naji breached the contract] is dependent upon the factual finding whether following closing of the sale, Mr. Naji *could have obtained from Chicago Title and provided to JAS Apartments an [ALTA] policy of title insurance that would insure the title conveyed to JAS Apartments with an exception for the marital interest of [Wife].*

The circuit court noted that the expert witness for both sides had agreed that item 15 **"could be converted into an exception that would carry over to the title policy."** (Emphasis added.) The circuit court found that:

> [Wife's] joining in the agreement was *not a requirement* imposed by Chicago Title for issuance of a title insurance

policy. It was an exception to the coverage and, therefore, Mr. Naji did not anticipatorily repudiate the contract because [Wife's] refusal did not thwart him from fulfilling his obligation to provide title insurance.

The circuit court then found that JAS, under the contract documents, "was willing to take whatever title Naji had, provided [JAS] had the opportunity to raise objections." The circuit court concluded that because JAS failed to timely object in writing to item 15, JAS had waived its right to receive marketable title. The circuit court found that JAS had breached the contract when it failed to close the transaction as scheduled. The circuit court also awarded attorney's fees to Naji under the contractual provision related to attorney's fees.

## The Second Appeal

JAS now appeals the circuit court's determination that item 15 in schedule B of the title commitment was converted into an *exception* to coverage rather than a requirement to be fulfilled before a policy would be issued. JAS contends that the circuit court erred in entering judgment in favor of Naji pursuant to that ruling. JAS asserts that the evidence at trial on remand established that Chicago Title would not issue title insurance or close the transaction unless that item was satisfied. JAS also argues that the circuit court accordingly erred in its ruling that Naji did not anticipatorily repudiate the contract.

## Standard of Review

JAS argues that the judgment is erroneous as a matter of law because the essential facts are not disputed and it is only the legal interpretation of the facts that is an issue in this case. JAS is essentially arguing that the circuit court misapplied the law. JAS also says that the circuit court's error in discerning the legal effect of the contract language and the language of the title commitment is "so conspicuous," in light of the evidence, that reversal is compelled even on the basis that the judgment is not supported by substantial evidence.

Naji disagrees, contending that the issue of whether item 15 in schedule B was a requirement or an exception was simply a factual determination of the circuit court to which this Court should defer.

■■■ This Court will affirm the judgment of the circuit court unless it misapplied or erroneously declared the law, or the judgment is not supported by substantial evidence, or the judgment is against the weight of the evidence. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *see also* Rule 84.13(d). If the issue is one of law, this Court reviews *de novo* to see if the circuit court misapplied the law. *Murphy*, 536 S.W.2d at 31. If the issue to be decided is one of fact, this Court determines whether the judgment is supported by substantial evidence and whether the judgment is against the weight of the evidence. *Id.* "Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree of judgment is wrong." *Id.*

## The Circuit Court Erroneously Construed the Opinion and Mandate in *Naji I*

■■ It is clear from the above-referenced conclusions of the circuit court that it erroneously interpreted the opinion in *Naji I*. The circuit court heard the testimony of the expert witnesses. The circuit court framed the issue as whether Chicago Title was willing to issue a policy one way or another, rather than whether item 15 was intended to be an exception or a requirement, as directed by the court of appeals. It is true that the experts who

testified on remand all agreed that item 15 "could be converted into an exception that would carry over to the title policy," but that fact entirely missed the point of the remand. The question the circuit court was to have answered on remand was: What was item 15 *during the contract's 10–day review period*—requirement or exception? If JAS is deemed to have waived all objection to the defect represented in that exception by failing to object to an exception within the 10–day review period, then JAS, *as buyer*, was *obligated* to proceed to closing and to accept a title encumbered by that defect with no title policy protection as to that defect. If, on the other hand, the burden was on Naji, *as seller*, to address a requirement to the satisfaction of the title company so that a title policy would be issued insuring marketable title and Naji did not do so, then Naji, *as seller*, breached the contract. That would mean that JAS properly had sought a legal remedy to enforce the contract.

The circuit court's judgment failed to make the necessary determination posed in *Naji I*. The circuit court's misinterpretation of the mandate in *Naji I* and failure to determine based on the record and the interpretation of the contract that the signature of Naji's spouse was a requirement constitutes a misapplication of law that requires this Court to reverse the circuit court's judgment.

This Court reviews the evidence presented on remand to determine whether the question *Naji I* expressly requested the circuit court to address—whether item 15 was intended as a requirement or an exception in the initial title commitment—was resolved so as to avoid the need to remand, once again, to resolve the same unanswered question.

### The Specific Evidence on Remand

■ Todd, who first testified in this matter on remand, explained why the introductory remarks to schedule B in this case referred only to "exceptions" when in fact the schedule typically included *both* requirements and exceptions. Todd explained that Chicago Title made the decision that its title commitments would include *both* the requirements and the exceptions in a single schedule B rather than in a separate schedule B–1 and schedule B–2 based on the circumstances and experiences unrelated to this case. He said that typically the exceptions were listed first, with some generally using straight "boilerplate" language. He said that applicable requirements were usually stated later.

Todd and Coghlan testified that item 15 (which provided that if the seller is a married man, his spouse must join in the transfer) is a requirement. They said that without the joinder of the spouse, the title company would not have been willing to issue a title policy insuring marketable title. Their testimony on this point was clear and unequivocal. For example, Todd testified as follows:

Q: Item No. 15, can you tell us what that is?

A: That's the requirement that if the seller is a married person that his spouse must join in the document transfer.

Q: That's very standard language of Chicago Title?

A: Yes.

Coghlan similarly testified, as follows:

Q: With ... many years of experience in the industry, is [Item 15] ambiguous in any way to you? In other words, as to whether this is a requirement or an exception?

A: It's not ambiguous to me, no.

Q:  What is it?

A:  It's a requirement.

Q:  It's not an exception?

A:  No, it's not.

According to Dunn–Walters, a "requirement" is something that must be done in order for a policy to issue (such as the payment of a premium for the policy or the furnishing by a corporation of its articles of incorporation). Dunn–Walters was not aware of any title commitments ever issued by Chicago Title in which the marital interest was listed as an exception instead of as a requirement. Moreover, Dunn–Walters specifically testified that for Chicago Title to have issued a title policy in this case with Wife's marital interest identified as an exception, the company would have required "written consent" from JAS. In this respect, Dunn–Walters's testimony was consistent with the testimony of Todd and Coghlan that the spousal consent item on this schedule B was a requirement and that converting the item into an exception would have required further negotiation and agreement of the parties.

Dunn–Walters' testimony, relied on by Naji for the supposition that an exception is something listed on schedule B and therefore the spousal signature requirement was an "exception," is inconsistent with the fact that the court of appeals concluded in *Naji I* that schedule B was ambiguous because one could not simply draw the conclusion that all items listed on schedule B were intended to be "exceptions."

Vestal spoke to the attorney for JAS on February 7, 2003, and advised based on her experience and the wording of the title commitment that the transaction "would not close without [Wife's] signature." This testimony reflects Chicago Title's intent that Wife's signature was a requirement that had to be satisfied before it would issue a title policy. Consistent with this, Vestal said in her testimony that exceptions are stated in the commitment in passive language, while requirements may direct an action, as the command in this case (*e.g.,* "the spouse … must join"). Vestal was a 25–year closing officer and very familiar with the way requirements and exceptions are stated on Chicago Title commitments.

As a matter of law, this Court determines that the evidence presented to the circuit court on remand was that item 15 was a *requirement at the time the title commitment was issued* and, therefore, during the review period. One would not expect a buyer to "object" in writing to a stated requirement in a title policy that directs performance of an act that will benefit the buyer. Unlike an "exception" to coverage, which a buyer can either elect to "live with" or "object to," a "requirement" that inures to the buyer's benefit is not a "matter" that any seller under a real estate contract could reasonably expect a buyer to object to, such that a failure to "object" would permit non-performance of the requirement. Coghlan's testimony supports this; he stated that item 15 in this schedule B was an item for the seller to attend to and not for the buyer to object to. Even Dunn–Walters agreed. When asked if she could think of "any reason" a buyer would object to the title company specifying that a spouse "must join" in the conveyance, she could not think of any reason.

■■■ Based on the record, this determination is also bolstered by industry custom and recognized practice. A requirement in a title commitment is a direction given by the title company that must be met for title insurance to issue. *See, e.g., Psaromatis v. English Holdings I, L.L.C.,* 944 A.2d 472, 482 n. 11 (D.C.2008). On the other hand, exceptions that are not met

"do not preclude the issuance of title insurance, but are disclosed as clouds on the title." *Id.* Vestal would not have advised JAS's attorney that Naji's failure to perform item 15 would mean no closing if it was merely an exception and not a requirement.

Item 15 was a requirement in the initial title commitment. Naji did not perform this requirement; therefore, Chicago Title would not issue a title policy *insuring marketable title* as Naji was contractually obligated to provide JAS. Undisputably, Naji could not get Wife to consent to the transaction. Therefore, he could not perform his contractual obligations to JAS. By advising that he would be unable to secure Wife's participation in the transaction just before closing, Naji anticipatorily breached the contract. It does not matter that Chicago Title could have converted item 15 to an exception, because JAS never agreed to modify the contract with Naji and to accept title to the property subject to Wife's marital interest.

■ Naji argues that the circuit court on remand reached its decision pursuant to "the law of the case" and that this Court cannot veer away from that interpretation of the opinion of the court of appeals. "[A] previous holding in a case constitutes the law of the case and precludes relitigation of the issue on remand and subsequent appeal." *Walton v. City of Berkeley*, 223 S.W.3d 126, 128–29 (Mo. banc 2007). However, the circuit court did not reach a decision that was responsive to the law of the case. The opinion in *Naji I* expressly provided:

> We remand for the circuit court to consider whether or not Naji breached the agreement and, if so, what the appropriate remedy should be.... Upon re-

mand, therefore, should the circuit court determine that Naji's conveyance of the property did not defraud his wife of her marital interests in the property, it is free to order specific performance.[12] ... We disagree that the circuit court had no evidence to support a finding that Naji anticipatorily repudiated the contract, excusing JAS Apartments' obligation to perform.

Anticipatory repudiation occurs when a party to a contract repudiates that contract by manifesting, by words or conduct, a positive intention not to perform. Naji undisputedly declared that his wife would not join in the sale, but we do not find a contractual obligation that he obtain his wife's signature on the contract. We do find a requirement that he obtain a policy insuring marketable fee simple title to the property subject to any exceptions in the title insurance to which JAS Apartments did not object.

**This brings us squarely to the issue of whether or not Chicago Title's provision concerning Hala Naji's joining in the agreement was an exception or a requirement. If it was a requirement, the circuit court may have a basis for finding that Naji anticipatorily repudiated the contract when he declared that Hala Naji would not join in the sale because that would have thwarted him from fulfilling his obligation to provide title insurance....**

If, on the other hand, the circuit court determines that the provision was an exception, it may have a basis for finding that Naji did not anticipatorily breach the contract because Hala Naji's signature was not required and that JAS Apartments did not object in writing to

---

12. It should be noted that, after eight years in litigation, JAS has abandoned its specific per-formance claim and now seeks damages and attorney fees.

the exception. In the latter case, perhaps, the circuit court could conclude that JAS Apartments breached the contract by refusing to close.

Resolution of this issue depends on the circuit court's factual finding of whether or not the title insurer intended the title insurance commitment to require Hala Naji's joining in the contract or whether or not Hala Naji's joining in the contract was an exception to the promised title insurance. Upon remand, the circuit court will resolve the issue. 230 S.W.3d 354, 359–62 (Mo.App.2007) (internal citations and quotations omitted) (emphasis added).

### Gifts in Fraud of Marital Rights

In 1955, the General Assembly generally abolished inchoate dower. A spouse, however, has statutory rights, such as the right of descent provided in § 474.010, RSMo 2000. *See Reinheimer v. Rhedans,* 327 S.W.2d 823, 828 (Mo.1959). Section 474.150, RSMo 2000, reads:

2. Any conveyance of real estate made by a married person at any time without the joinder or other written express assent of his spouse, made at any time, duly acknowledged, is deemed to be in fraud of the marital rights of his spouse, if the spouse becomes a surviving spouse, unless the contrary is shown.

### Remand

This Court concludes that Naji breached the contract with JAS. Upon Naji's anticipatory repudiation of the contract, JAS

could have declared the contract canceled due to Naji's inability to convey insured marketable title and could have recovered its earnest money and walked away. JAS, however, also had the right to pursue litigation to gain marketable title through cancellation of the claim of marital interest and specific performance of the contract or damages. Although this litigation sadly, already has gorged itself to an unseemly degree on the resources of these parties, this Court must remand again so the circuit court can determine the appropriate remedy for Naji's breach of contract.

JAS in its brief and at oral argument indicated it no longer seeks the equitable remedy of specific performance. Further, a significant time has passed since the parties' contract was set to close.

It may be that, for other reasons, the equitable remedy of specific performance no longer remains an appropriate remedy. Should the circuit court on remand so determine, an award of damages to JAS may be appropriate.[13]

This Court faced a similar set of circumstances in *Bobst v. Sons,* 252 S.W.2d 303 (Mo.1952). In *Bobst,* the husband entered into a contract to sell property he owned as tenants by the entirety with his wife. *Id.* at 304. The wife refused to agree to the transaction. *Id.* This Court held that "[i]t is not unlawful for a person to contract to sell and convey something he does not own but expects to acquire, and, if he unqualifiedly undertakes to do that which later he finds he cannot perform, he should

---

**13.** Some authorities do suggest that this measure of damages is not appropriate in the absence of fraud on the part of the vendor. 25 *Williston on Contracts* § 66:82 (4th ed.). However,

any rule that the purchaser cannot recover for the loss of bargain due to the vendor's inability to convey marketable title where the vendor acted in good faith in entering

into the contract has been regarded as inapplicable *where the reason for the vendor's breach is the refusal of his or her spouse to join in the conveyance,* on the theory that a breach of this sort constitutes such fraud on the part of the vendor as to entitle the purchaser to compensation for the loss of the bargain.

*Id.* (emphasis added).

suffer the liability the law imposes upon the contract breaker." *Id.* at 305. This Court remanded that case to determine damages. *Id.* Observing that specific performance was being sought by the buyer, this Court noted:

> [T]he rule generally followed in specific performance cases is that if specific performance cannot be ordered because of a disability due to a defect in the vendor's title existing at the time of entering into the contract, or other similar reason ... then, although the Court cannot grant a specific performance, it will retain the cause, assess the plaintiff's damages, and decree a pecuniary judgment in place of the purely equitable relief originally demanded.

*Id.* at 305–06. The circuit court will have the power to assess whether specific performance remains an appropriate remedy and, if not, to award JAS compensatory relief.

The remedy the circuit court fashions on remand will also require consideration of JAS's claim for attorneys' fees. The contract of sale in this case had the following provision:

> If, as a result of a default under this Contract, either Seller or Buyer employs an attorney to enforce its rights, the defaulting party shall, unless prohibited by law, reimburse the nondefaulting party for all reasonable attorney's fees, court costs and other legal expenses incurred by the nonbreaching party in connection with the default.

If the circuit court determines that fees are to be awarded JAS for Naji's breach of contract, the circuit court must consider all of the pertinent facts and circumstances, as the contract specifies. These circumstances may include the confusion intro-

duced into the case by factors such as the fact that Chicago Title's schedule B was ambiguous because it included both requirements and exceptions.

The court also may consider why Naji, who supposedly stood ready to close and was very happy with the purchase price, has so strenuously litigated against JAS's efforts to nullify any claim of marital interest so as to permit him to complete the transaction.

## Conclusion

The judgment of the circuit court is reversed, and the case is remanded.[14]

TEITELMAN, C.J., RUSSELL, BRECKENRIDGE, STITH and PRICE JJ., and PRITCHETT, Sp.J. concur.

DRAPER, J., not participating.

---

14. Shortly before and after oral argument, both sides filed motions regarding attorneys' fees and costs on appeal. Because this case is being remanded to the circuit court, there is no reason for this Court to further address these motions.