SHAWNEE BEND DEVELOPMENT COMPANY, LLC, Plaintiff–Appellant,

v.

LAKE REGION WATER & SEWER COMPANY, f/k/a Four Seasons Water & Sewer Company, Defendant–Respondent.

No. SD 32077.

Missouri Court of Appeals, Southern District, Division Two.

March 25, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 15, 2013.

Application for Transfer Denied June 25, 2013.

Gregory David Williams, Sunrise Beach, MO, for Appellant.

Mark Wood Comley, Jefferson City, MO, for Respondent.

**DON E. BURRELL, J.**

Plaintiff Shawnee Bend Development Co., LLC ("Developer") appeals what it claims is an inadequate judgment against Lake Region Water & Sewer Co. ("Company") in the amount of $66,375.00 (plus interest) for breach of contract.[1] Developer had constructed what the trial court described as "a major real estate development" known as "The Villages" near Lake of the Ozarks in Camden County. Company provides public water and sewer services in Camden County subject to regulation by the Missouri Public Service Commission ("the PSC").[2] To provide water and sewer services to the residents of The Villages, Developer and Company executed a series of three contracts.

Developer contends the trial court's judgment was inadequate because it did not enforce Company's obligation to pay Developer $1,000 each time a new customer connected to the water source built by Developer ("the well"). Developer contends such an obligation existed because: "the contracts between the parties" provided for reimbursement as required by the PSC's rules; the trial court's interpretation of the contracts would render "the contract [sic] illegal because it is inconsistent with the tariff issued by the PSC for [Company]"; and the "cause of action did not accrue until the last payment was due under each contract, which was less than 10 years before [Developer] filed the instant suit[,]" referring to the 10–year statute of limitation set forth in section 516.100.[3]

---

1. Company also filed a notice of appeal, which it subsequently voluntarily dismissed.

2. Company, which "was formerly known as Four Seasons Water and Sewer Company[,]" changed its name in December 1998. In May 1999, Company filed a notice with the PSC that it had adopted and ratified "all tariffs, schedules, rules, notices or other instruments filed with the [PSC] ... by Four Seasons Water [and] Sewer Co." The name change was also approved by the PSC that same month.

3. All statutory references are to RSMo 2000.

Because we agree that the parties' first contract required Company to pay Developer such a fee for each customer who connected to the well within 10 years of its construction (capped at the cost of constructing the well) and Developer's cause of action accrued upon the last payment of money due under that contract, we reverse the judgment and remand the matter to the trial court to render a judgment based on the applicable evidence submitted by the parties and the law as set forth in this opinion.

## Facts and Procedural Background

The evidence was presented to the trial court solely in the form of the following written records: a joint exhibit, including a stipulation of facts with attached "schedules"; additional exhibits received individually from the parties; and a supplemental stipulation. No live testimony was presented by either party. We present only those facts necessary to resolve Developer's claim that the trial court misapplied the law in interpreting the parties' contracts.

Company provides its services to the public subject to tariffs approved by the PSC. The applicable tariffs include rules. Rule 1 in Company's tariff addressing water service defines certain terms that are relevant to our analysis.

(a) An "APPLICANT" is a person, firm, corporation, governmental body, or other entity which has applied for service; two or more APPLICANTS may make one application for a main extension.

(b) The "COMPANY" is [Company] acting through its officers, managers, or other duly authorized employees or agents.

(c) A "CUSTOMER" is any person, firm, corporation or governmental body which has contracted with [Company] for water service or is receiving service from [Company], or whose facilities are connected for utilizing such service.

. . . .

(e) A "DEVELOPER" is any person, firm, corporation, partnership or any entity that, directly or indirectly, holds title to, or sells or leases, or offers to sell or lease, or advertises for sale or lease, any lots in a subdivision.[4]

. . . .

(g) The "MAIN" is a pipeline which is owned and maintained by [C]ompany, located on public property or private easements, and used to transport water throughout [Company's] service area.

Rule 14 of Company's tariff addresses the extension of water mains and includes provisions regarding how an applicant is to be subsidized for creating a new source for supplying water:

(c) When the applicant's property is too far from existing facilities and it is economical for a new source of supply to be constructed to serve the applicant's property, the applicant may be required, as a part of the extension agreement, to subsidize the costs associated with said new source until enough additional customers justify the cost to [Company] of owning and operating said source of supply. Such subsidization shall be based on a limit of capital investment by [Company] of $1,000 per customer connected to the said new

4. The parties do not specifically address Developer's characterization both as an applicant and developer under the rules, but each of the contracts between them acknowledge that Company "has been authorized by [the PSC] to provide water and sewer services within the area ... which includes the [p]roperty" described in the contracts.

source, not to exceed the original cost to construct the well and applicable appurtenances and only during the first ten years following completion of an approved facility. Said new supply source (well) shall be in lieu of a main extension and to follow the same rules as a main extension.

. . . .

(f) Refunds of contributions shall be made to applicant(s) as follows:

. . . .

(2) During the first ten years after the main extension is completed, [Company] will refund to the applicant(s) who paid for the extension moneys collected from applicant(s) in accordance with paragraph (e) above [describing a method to calculate a per lot charge with a multiplying factor for larger commercial meters]. The refund shall be paid within 30 days after the money is collected.

(3) During the first ten years after a new source of supply is constructed, [Company] will refund to the applicant $1,000 for each new customer connected to the system constructed in accordance with Rule 14(c), not to exceed the subsidization made by the applicant in lieu of a main extension.

. . . .

(h) [Company] reserves the right to further extend the main and to connect mains on intersecting streets and easements. Connecting new customers to such further extensions shall not entitle the applicant(s) paying for the original extension to a refund for the connection of such customers. Ten (10) years after an extension, both the refunds to the original applicants and payment to [Company] by new customers, cease for that extension.

On April 10, 1998, the parties executed an "Agreement Regarding the Installation of Water Mains, a Water Well, Sanitary Sewers and Appurtenances, and Road Crossings" ("Contract 1"). Under that agreement, Developer constructed "a new source of water in the form of [the] well[,]" water mains, sewer facilities, and a sewer "Trunk Line" with "excess capacity" ("the trunk line") to the satisfaction of Company. Contract 1 specifically states that the construction was "to be installed in the development to be known as THE VILLAGES at Shawnee Bend, further described on Exhibit A hereto (the 'Property') by an independent contractor engaged by Developer." Exhibit A was a legal description labeled "STONEBRIDGE VILLAGE of THE VILLAGES at SHAWNEE BEND" and described "84.10 [a]cres" ("Area 1").[5]

Concerning the construction of the well, Article I of Contract 1 provides:

C. New Source Water Well

[Company] hereby agrees that the Property is too far from its existing facilities and it is more economical for a new source of supply to be constructed to serve the Property. Therefore, Developer shall install a new source of water in the form of a well which meets those specifications set forth in the Improvements [sic] Plans. The Improvement Plans shall require the well to meet all applicable state standards for public drinking water supply wells and that the well be approved by the State of Missouri. Upon completion of the well, Develop-

---

**5.** Developed in phases, the entire area of The Villages eventually encompassed about 720 acres in Camden County. Some lots in The Villages remained unsold at the time of trial.

er shall deliver to Company an itemized statement of all costs associated with the construction of said well and applicable appurtenances for the purpose of determining the maximum amount of the subsidy to be paid by Company to Developer in the amount of One Thousand Dollars ($1,000.00) per customer connected to this well, not to exceed the original cost to construct the well and applicable appurtenances and only during the first ten (10) years following completion of an approved facility, all as set forth in Rule 14(c) of the PSC Water Rules. Company shall make the subsidy payment to Developer within 30 days of the connection of the customer to the extension.

In addition to $1,000 per customer connecting to the well, Contract 1 provides for the payment of Developer's costs in constructing the trunk line that would provide a capacity exceeding the needs of The Villages to "serve other customers of Company[.]"[6] The cost of constructing the trunk line was $28,950. Contract 1 also addresses Developer's obligation to install facilities in what would eventually become "road crossings" after roadways were completed. Company would compensate Developer for this work by paying Developer $375 "for each customer which is permanently connected to both the water and sewer system" ("roadway connections") during the term of the agreement.[7] The term of the agreement is 15 years.

In August 1998, the parties executed an "Agreement Regarding the Installation of Water Mains, Sanitary Sewers, and Appurtenances, and Road Crossings ("Contract 2"). Contract 2 incorporates an exhibit bearing a legal description of parts of The Villages that is different from Area 1. The tract is described as containing 46.22 acres, and the parties stipulated that it is comprised of " 'Woodhaven Village' and 'Woodhaven Village First Addition' of The Villages" ("Area 2"). Developer constructed the facilities described in Contract 2 "to the satisfaction of [Company] within the time specified in the contract."

On November 23, 1998, Developer sent a request for reimbursement of costs "per the Agreement of April 10, 1998" (Contract 1). The request incorporated a list of amounts based upon actual funds expended, including the total sum of $111,672.85 for the "Water Well and Appurtenances." The request and its accompanying list did not specifically refer to any amounts due based upon customer connections. That same month, Developer conveyed to Company "a permanent easement" to the well, and Developer agrees that "title" to the well "is vested in [Company]."

In June 1999, the parties executed another "Agreement Regarding the Installation of Water Mains, Sanitary Sewers and Appurtenances, and Road Crossings" ("Contract 3"). The exhibit describing the property for purposes of Contract 3 refers to the property as "Forestridge Village of the Village [a]t Shawnee Bend" and references a recorded description that does not contain an acreage summary ("Area 3"). Developer constructed the facilities described in Contract 3 within the time permitted by the contract and to the satisfaction of Company.

**6.** Rule 12(8) of Company's "Rules Governing Rendering of Sewer Service" provides that Company shall bear this expense.

**7.** None of the PSC rules deposited by the parties with this court seem to expressly govern how Developer should be subsidized for the provision of the "road crossing[ ]" facilities. The schedule of rates in Company's tariff limits customer water connection charges to $610 each and sewer connection charges to $280 each.

Unlike Contract 1, contracts 2 and 3 do not expressly mention a $1,000 per-customer payment for connections to the well. All three contracts do, however, explicitly state that Company is governed by its "PSC-approved tariff consisting of rate schedules and rules and regulations governing the provision of water and sewer service (individually 'PSC Water Rules' and 'PSC Sewer Rules' and collectively 'PSC rules')[.]" Like Contract 1, contracts 2 and 3 also address the placement of facilities in road crossings and provide that $375 would be paid by Company to Developer for roadway connections. Contracts 2 and 3 also provide that the term of the respective agreement is 15 years from the date of the contract.

Section E of Article IV in each contract addresses "Refunds and Recoupments" as follows:

[Company] shall provide reimbursement payments to Developer pertaining to the subject matter of this Agreement in the manner required by the PSC rules, as the same may change from time to time, and shall not treat Developer any differently in that regard than [Company] treats any other similarly situated developer.

Under this same article, section K of each contract provides that "[w]ith the exception of the provision on payment of [inspection fees], nothing in this Agreement is intended to conflict with the PSC rules. If such a conflict later becomes apparent, the PSC rules shall control."

The parties stipulated that between April 10, 1998 to April 9, 2008, 31 customers within Area 1 "connected to the well[,]" and a total of 111 customers "within [T]he Villages ... ha[d] connected to the well." Regarding road connections, 121 customers in The Villages had permanently connected to water and sewer systems from April 10, 1998, to the date of trial.

Developer sent Company a letter in November 2004 requesting payment of "$1,000.00 for every house in [The Villages], that has been connected to [Company] lines [sic] and $375.00 for every house connected to [Company's] water and sewer lines." Developer repeated its request for payment in letters sent in January and February 2006 and again in September 2007.

After Company failed to pay Developer as requested, Developer filed its lawsuit on October 8, 2009 (asserting theories of breach of contract, quantum meruit, and fraud), and the matter was subsequently tried to the court in December 2011. After the filing of suggested findings of fact and conclusions of law by Developer, and the receipt of a supplemental stipulation requested by the trial court, the challenged judgment was entered on March 23, 2012.

The judgment found that the lot owners identified on both Plaintiff's Exhibit 1 (a spreadsheet associating various connection information with listed lots) and Defendant's Exhibit A (also a spreadsheet associating various connection information with listed lots) had received water and sewer services from Company. The trial court found that Contract 1 was unambiguous and that "the parties considered The Villages, for purposes of the agreement, to be the 84.10 acres described on Exhibit A of Contract 1" (Area 1). It further found that the "well was to be constructed to serve the 'Property' (synonymous with 'The Villages' in Contract 1) and no other tract." The trial court found "that Contract 1 obligates [Company] to pay [Developer] the specified fee of $1,000.00 for connections to the well made only by customers located within [Area 1]." According to an exhibit the trial court incorporated into the judgment (Exhibit A), which relied on but differed somewhat from Defen-

dant's Exhibit A, there were 24 such customers, the last one having connected on December 6, 2006.

The trial court found that the three contracts obligated Company to pay Developer $375 for each customer "permanently connected to both the water and sewer system within the real property described on Exhibit A to each Contract" (areas 1, 2, and 3). The date of the last roadway connection reflected on Exhibit A was November 10, 2010. And while the trial court also found the $28,950 cost of the trunk line to be an obligation of Company, it additionally found that "the amount owed for the [t]runk [l]ine, and amounts owed for well connections or road crossings that became due ten years or more before the date this action was filed [we]re time barred" under section 516.110.[8]

Exhibit A to the judgment reflected connection fees that the trial court did not consider time barred: $33,000 total for 24 customers in Area 1 with well and roadway connections and $33,375.00 total for 89 customers in areas 2 and 3 based solely upon roadway connections. The trial court then ordered interest at 9% per annum "from the date when the connection fee was due and payable" to the date of judgment. In addition, a per diem rate of $0.34 was applied to the fees due under Contract 1 and a $0.09 per diem rate was applied to the fees due under contracts 2 and 3 from the date of the judgment. The trial court denied relief in quantum meruit because recovery was had on the breach of contract

claim, and it found that "[t]he evidence in this case simply does not support a claim of fraud." [9]

## Applicable Principles of Review

The judgment in a court-tried case will be affirmed "unless it misapplied or erroneously declared the law, or the judgment is not supported by substantial evidence, or the judgment is against the weight of the evidence." *JAS Apartments, Inc. v. Naji*, 354 S.W.3d 175, 182 (Mo. banc 2011) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). "[W]here the evidence is uncontested, 'the only question before the appellate court is whether the trial court drew the proper legal conclusions from the facts stipulated.'" *Korte v. Director of Revenue*, 352 S.W.3d 610, 614 (Mo.App. S.D.2011) (quoting *White v. Director of Revenue*, 321 S.W.3d 298, 308 (Mo. banc 2010)). We review *de novo* whether the trial court misapplied the law to the stipulated facts. *JAS Apartments, Inc.*, 354 S.W.3d at 182.

## Analysis

### Points I and II—Well Connections

■ Developer's first point states:
The Trial Court erred in entering an inadequate judgment in favor of [Developer], because the [trial] court incorrectly interpreted the contracts between the parties in that the [trial] court held Contract 2 and Contract 3 do not require

8. In calculating the claims that were time-barred, the trial court stated:

This means that the amount owed for the [t]runk [l]ine, and amounts owed for well connections or road crossings that became due ten years or more before the date this action was filed are time barred. Payments under the contracts were due 30 days after connection. This case was filed on October 8, 2009. Therefore, amounts due for connections made prior to September 8, 1999 are time barred. The amount due for the

[t]runk [l]ine was ascertained at least by November 23, 1998. [Citing Developer's November 1998 request to Company for reimbursement of expenses]. Suit was filed more than 10 years after this date. Therefore the claim for the [t]runk [l]ine is time barred.

9. Developer does not appeal the trial court's denial of damages based upon quantum meruit and fraud.

[Company] to pay [Developer] $1,000.00 for each customer connected to the well [Developer] constructed, even though the contracts provide that [Company] would reimburse payments to [Developer] as required by the PSC rules, and the PSC's rules required such a payment.

Developer's second point is similar; it contends that the trial court's interpretation of each contract "is inconsistent with the tariff issued by the PSC for [Company]." We agree. Because each point asserts that Company's tariff and the PSC's rules are incorporated into the contracts and are controlling, we address them together.

At the outset, we note that the trial court did not explicitly hold that the specific language of contracts 2 and 3 was the basis for its finding that Company was not obligated to pay for customers outside of Area 1 who connected to the well. The trial court stated that the parties framed the issue at trial as "whether [Company] owes [Developer] the specified fee for connections to the well made only by customers located within [Area 1] [from] Contract 1, or whether [Company] owes [Developer] for well connections made by any customer located in The Villages." The trial court answered that question in favor of the former proposition based on its erroneous interpretation of Contract 1.

"The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003). "Where the language of a contract is unambiguous, the intent of the parties is to be gathered from the contract alone, and a court will not resort to construction where the intent of the parties is expressed in clear, unambiguous language." *Id.* at 428–29. Our disagreement with the trial court is based on the effect of the contracts' incorporation of Company's tariff and PSC rules.

■ It is "well settled that matters incorporated into a contract by reference are as much a part of the contract as if set out in haec verba." *Trantham v. Old Republic Ins. Co.*, 797 S.W.2d 771, 774 (Mo. App. E.D.1990). "Where a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively a part of the writing, and in that respect the two form a single instrument." *Intertel, Inc. v. Sedgwick Claims Mgmt. Servs., Inc.*, 204 S.W.3d 183, 196 (Mo.App. E.D.2006). Additionally, "[a] construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Dunn Indus. Grp., Inc.*, 112 S.W.3d at 428.

Here, Contract 1 was clear in describing Area 1 as the location for the contracted improvements. Contracts 2 and 3 are also clear in describing areas 2 and 3 as properties to receive additional contracted improvements, and neither of them contained any express provision that customers connecting to the well from areas 2 or 3 would trigger an obligation by Company to pay Developer $1,000 for each connection. Although the trial court apparently found this omission significant, its absence did nothing to remove Company's obligation under Contract 1 to pay Developer $1,000 each time a "customer" of Company connected to the well.

Contract 1 states that Company is governed by its "PSC-approved tariff," including the "PSC Water Rules," and that, except for inspector fees, "nothing in this Agreement is intended to conflict with the PSC rules. If such a conflict later becomes apparent, the PSC rules shall control." Contract 1 states that $1,000 would be paid *"per customer connected to this*

*well,* not to exceed the original cost to construct the well and applicable appurtenances and only during the first ten (10) years following completion of an approved facility, all as set forth in Rule 14(c) of the PSC Water Rules." (Emphasis added.)

Rule 1(c) of the PSC's Water Rules defines "customer" as "*any* person, firm, corporation or governmental body which has contracted with [Company] for water service or is receiving service from [Company], or whose facilities are connected for utilizing such service." (Emphasis added.) As a result, for purposes of Contract 1, a customer is not defined by a geographic area; it is defined by a relationship with Company. These water rules are specifically incorporated into Contract 1, *see Trantham,* 797 S.W.2d at 774 and *Intertel, Inc.,* 204 S.W.3d at 196, and the contracts provide that the water rules are to be controlling over any conflicting provisions.

Developer supplied the well as required by Contract 1. Regardless of the area defined in Contract 1 for the placement of the well, Company had an obligation under Contract 1 to subsidize Developer for each customer who connected to that well within 10 years of its construction, up to the cost of the well. Contracts 2 and 3 do not purport to revoke Contract 1, and more importantly Company does not assert that any change in Company's tariff or PSC rules occurred between the execution of Contract 1 and the execution of contracts 2 and 3. As a result, contracts 2 and 3 did nothing to remove the obligation created by Contract 1. *Cf. Railway Exch. Bldg. v. Light & Dev. Co.,* 341 Mo. 334, 107 S.W.2d 59, 61 (1937) (the power of the PSC "overrides all contracts contrary to its purposes of uniformity").

Company emphasizes the provision in Rule 14(h) that "[c]onnecting new customers to such further extensions shall not entitle the applicant(s) paying for the original extension to a refund for the connec-

tion of such customers." Rule 14(c) also states that the "new supply source (well) shall be in lieu of a main extension and to follow the same rules as a main extension." But, as Developer points out, that does not mean that the terms "new supply source (well)" and "main extension" are used interchangeably in Rule 14. Indeed, Rule 14(f)(2) provides for the reimbursement of customer connections made to the main extension based upon a formula set forth in Rule 14(e) for determining a cost per lot, and Rule 14(f)(3) describes reimbursement of customer connections to the "new source of supply" at the flat rate of $1,000 each up to the actual cost of the well.

Rule 14(h) goes on to provide that "[t]en (10) years after an extension, both the refunds to the original applicants and payment to [Company] by new customers, [sic] cease for that extension." This sentence emphasizes that the outer limit on reimbursement to an applicant for the cost of the main extension or new source of supply created for by that applicant is the passage of ten years from the construction of either the main extension or the new source of supply. It is consistent with the same temporal limitations in Rules 14(f)(1) and (2). If the language emphasized by Company applied to prohibit payment for new customers connecting to the initial well constructed by Developer (and not some additional well), it would be in conflict with the above-noted additional language set forth in Rules 14(c), (f)(2), and (h). We must prefer a reconciled meaning over one that would maintain contradictory provisions. *See Dunn Indus. Grp.,* 112 S.W.3d at 428. We therefore find that Rule 14(h) does not curtail Company's obligation under Rules 14(c) and (f)(2) to pay $1,000 to Developer for each customer connecting to the well until ten years has passed or the cost of the well and applicable appurtenances has been reimbursed, whichever comes first.

The trial court erroneously applied the law by interpreting Contract 1 in a manner inconsistent with its incorporated tariff and PSC rules. Points I and II are granted.

### Point III—Statute of limitations

■ Developer's third point claims the trial court erroneously applied the law in finding that some of Developer's alleged damages were time barred under the ten-year statute of limitation set forth in section 516.110 because Developer's "cause of action did not accrue until the last payment was due under each contract, which was less than 10 years before [Developer] filed the instant suit[.]" We agree.

Section 516.110(1) provides that "[a]n action upon any writing, whether sealed or unsealed, for the payment of money or property" shall be brought within ten years. This section

> applies to every breach of contract action in which the plaintiff seeks a judgment from the defendant for payment of money the defendant agreed to pay in a written contract. Section 516.110(1) imposes no requirement that the amount the defendant owes as a result of the written contract be determinable without resort to extrinsic evidence[.]

*Hughes Dev. Co. v. Omega Realty Co.*, 951 S.W.2d 615, 617 (Mo. banc 1997).

A separate statute governs when Developer's cause of action is deemed to have accrued for purposes of determining when the 10–year limitation period started running. That section provides in pertinent part that

> the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recov-

ered, and full and complete relief obtained.

Section 516.100.

Developer relies on *Sabine v. Leonard*, 322 S.W.2d 831, 837 (Mo. banc 1959), as supporting the premise that its cause of action did not accrue until the last payment from Company was due, "so that all damages (unpaid installments) may be recovered and complete relief may be obtained in one action." While we do not find *Sabine* to be directly on point, we do find it instructive. *Sabine* involved a 1925 promissory note that required regular payments on a specific schedule. *Id.* at 833. The debtors made only one payment on the note. If the payments had been made as scheduled, "the last principal payment would have been made on May 1, 1938." Despite the fact that only one payment had actually been made, our supreme court held that the creditor's action on the note, filed March 27, 1948, was not time-barred because it was brought "less than ten years from the date the last payment became due." *Id.* at 837. The Court rejected the debtors' claim "that the statute of limitation ran on each installment ten years after it became due" because section 516.100 had been amended so as to include, *inter alia*, the same proviso at issue in the instant case: "if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained." *Id.* In reaching its conclusion, the Court reasoned:

> The legislature, probably for the purpose of avoiding a multiplicity of suits, as we construe Section 516.100, has seen fit to provide that in suits upon contracts where there is 'more than one item of damage' (installment) 'the cause of action shall not be deemed to accrue' (for the purpose of certain sections, including 516.110) until the last item of damage is

sustained (last installment becomes due) so that all damages (installments) 'may be recovered, and full and complete relief obtained' in one action.

*Id.* at 838.[10] *See also Ryerson v. Hemar Ins. Corp. of America,* 200 S.W.3d 170, 173 (Mo.App. E.D.2006) ("the date that the statute of limitations commences to run on an installment note is the date the last installment of the note is due").

Company asserts that the instant case is controlled not by *Sabine* but by the rules articulated in *Linn Reorganized School Dist. No. 2 of Osage Cnty. v. Butler Mfg. Co.,* 672 S.W.2d 340 (Mo. banc 1984). *Linn Reorganized School Dist.* involved breach of contract and warranty claims brought against multiple defendants who had constructed a gymnasium roof. *Id.* at 340–41. While the parties there contested whether the five-year statute of limitation in section 516.120 (regarding other actions on contracts) or the ten-year statute of limitation under section 516.110 applied to their dispute, our supreme court found it immaterial because the action "was properly commenced within the shorter five year period." *Id.* at 340, 342. Although the plaintiff realized that the roof was leaking in July 1972, construction continued on the interior of the building until at least November 1972. Plaintiff then filed suit in October 1977, just over five years after the roof began leaking. *Id.* at 340, 341.

The Court first found that the plaintiff's damages were not "capable of ascertain-ment" when the roof first began to leak. *Id.* at 344. It also rejected the suggestion that "a claimant would have to sue a roofer within five years of the first leakage, although the remainder of a project might well extend beyond a five-year period[.]" *Id.* at 342. In so holding, the Court quoted as follows from *Davis v. Laclede Gas Co.,* 603 S.W.2d 554, 556 (Mo. banc 1980) (a case involving both a tort claim and a claim based on the breach of an oral contract):

> We have concluded that the following rule of law should be applied *in the peculiar and particular circumstances* of this case: if the wrong done is of such a character that it may be said that all of the damages, past and future, are capable of ascertainment in a single action so that the entire damage accrues in the first instance, the statute of limitation begins to run from that time. If, on the other hand, the wrong may be said to continue from day to day, and to create a fresh injury from day to day, and the wrong is capable of being terminated, a right of action exists for <u>the damages suffered within the statutory period immediately preceding suit.</u>

*Id.* at 343. (Underlined emphasis is ours.)

Another case we find instructive is *Kansas City v. Kansas City Transit, Inc.,* 406 S.W.2d 18, 19 (Mo. banc 1966), in which our high court considered a claim for breach of a long-standing contract (dating as far back as 1917) that obligated the

---

10. The Court also distinguished the question of when an action on a contract accrued from the accrual of an action resulting from a claim for personal injury:

> We recognize that in the personal injury case hereafter cited, the fact that it became necessary to perform an operation upon the plaintiff three years after the injury, was held (under Section 516.100) not to delay the commencement of the limitation period, the court stating in the opinion that such

matters were 'but aggravating circumstances enhancing the legal injury already inflicted, and constituting mere developments of such injury, and were not of a character to delay the accrual of the cause of action.' *Allison v. Missouri Power & Light Co.,* Mo.App., 59 S.W.2d 771, 773 (1933). However, that is not the situation in the case at bar. Here, we do not have the mere development of a cause of action. *Id.*

payment of money "for the construction, maintenance, and reconstruction of" a viaduct. In April 1954, the transit company denied the city's demand that it pay its share of flood repair expenses. *Id.* at 21, 24. In 1960, the city expended additional monies for the repair of a dangerous situation on the viaduct. It then sued the transit company in June 1964, after the company refused to pay for a share of those repairs. *Id.* at 19, 21, 24. The transit company argued that its breach dated back to its first refusal to pay in 1954 so that the lawsuit initiated just over ten years later was not within the applicable statute of limitation. *Id.* at 24. The Court addressed the language of section 516.100, which, as today, included that the cause of action accrues "when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item[.]" *Id.* at 25. Our high court found the language "self-explanatory[.]" *Id.* Relying on *Sabine,* it stated that "if the contract is to be construed as providing for a series of installments [then] suit was appropriately instituted within ten years of the accrual of the last installment." *Id.*

We find *Sabine* and *Kansas City Transit, Inc.* more analogous to the instant case than *Linn Reorganized School Dist.* In *Sabine,* the schedule of required payments was known in advance. 322 S.W.2d at 833. In *Kansas City Transit, Inc.,* the payment obligations varied depending upon the maintenance requirements of the viaduct. 406 S.W.2d at 20. The instant case is situated somewhere between the two; Developer controlled the date of installation of the well, but it did not control, or even know in advance, when Company's customers would connect to it. Under these particular circumstances, we hold that each failure to pay money owed under the contracts represented an item of damage that ultimately combined to produce multiple instances of damages. In this context,

section 516.100's provision for the accrual of a cause of action upon the last item of damage, when there are multiple items of damage, "so that *all resulting damage may be recovered, and full and complete relief obtained*" seems likewise self-explanatory and controlling. (Emphasis added.) *See Kansas City Transit, Inc.,* 406 S.W.2d at 25. Point III is also granted.

The judgment is reversed. Because the trial court did not determine how many customers connected to the well within 10 years of its construction and/or made permanent connection to the water and sewer systems within the 15–year term of each contract, we remand the case to the trial court, which is hereby directed to make that determination from the written evidence submitted by the parties and enter judgment accordingly.

DANIEL E. SCOTT, P.J. and JEFFREY W. BATES, J., concur.