

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

IN THE MATTER OF: M.L.H., )
                Appellant, )
                            )
v.                         )   WD84193
                            )
JUVENILE OFFICER,       )   FILED: October 19, 2021
              Respondent. )

**Appeal from the Circuit Court of Buchanan County**
**The Honorable Patrick K. Robb, Judge**

**Before Division Two: Mark D. Pfeiffer, P.J., and**
**Alok Ahuja and Anthony Rex Gabbert, JJ.**

M.L.H. is a juvenile. The Circuit Court of Buchanan County entered a judgment finding that she committed acts which, if committed by an adult, would constitute the felony of tampering with electronic monitoring equipment, in violation of § 575.205,[1] and the misdemeanor of assault in the fourth degree, in violation of § 565.056.1. M.L.H. appeals. With respect to her adjudication for assault, M.L.H. argues that the circuit court applied the incorrect legal standard in determining that she had acted recklessly. She also argues that the court's finding that she had not acted in self-defense was against the weight of the evidence. With respect to the adjudication for tampering with electronic monitoring equipment, M.L.H. argues that the evidence was insufficient to prove that she had been required by court order to wear such equipment.

We affirm.

---

[1] Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2020 Cumulative Supplement.

## Factual Background

In June 2020, the Juvenile Officer filed a petition accusing M.L.H., who was then fourteen years old, of committing acts which would constitute felony stealing and misdemeanor domestic assault in the fourth degree, if committed by an adult. M.L.H. admitted the allegations on June 18, 2020. The circuit court took jurisdiction over M.L.H., placed her on probation in the custody of her legal guardian (her aunt), and required M.L.H. to take part in an electronic monitoring program. The court imposed an additional term of electronic monitoring on August 24, 2020.

On September 10, 2020, the Juvenile Officer filed a motion to modify the court's previous dispositional order, alleging that M.L.H. had since committed acts which would constitute the felony of tampering with electronic monitoring equipment in violation of § 575.205 (Count I), and the status offense of habitual absence from the home, in violation of § 211.031.1(2)(c) (Count II). On September 14, 2020, the circuit court ordered that M.L.H. be placed in a juvenile detention facility pending resolution of the motion to modify.

While in juvenile detention in Buchanan County, M.L.H. assaulted Brenae' Tate, a detention aide, on September 29, 2020. The Juvenile Officer filed a first amended motion to modify, adding an allegation that M.L.H. committed the misdemeanor of assault in the fourth degree, in violation of § 565.056.1(1) (Count III) by "recklessly caus[ing] physical pain to [Tate] by striking her multiple times."

The circuit court held an adjudication hearing on November 18, 2020. M.L.H.'s aunt testified that on September 3, 2020, M.L.H. had been on house arrest, but left to spend time with a friend. When M.L.H. failed to return home, her aunt made a runaway report with the St. Joseph Police Department. M.L.H.'s aunt testified that M.L.H. was required to wear an electronic monitoring bracelet at the time, and that she was wearing the bracelet when her aunt last saw her. However,

when M.L.H. was found on September 9, 2020, she was no longer wearing her monitoring bracelet. Her aunt testified that M.L.H. told her that someone had cut the bracelet off, and told her aunt the general area where the bracelet could be found.

Brenae' Tate, the victim of M.L.H.'s assault, testified that she was a detention aide at the Buchanan County facility where M.L.H. was detained. Tate testified that around 8:45 p.m. on September 29, 2020, she was bringing around a cart of hygiene products to M.L.H. and the other three female residents of the facility. The hygiene bags Tate was distributing included toothpaste and a toothbrush, deodorant, and a hairbrush. When Tate entered the detention dayroom with the cart, M.L.H. appeared agitated and was kicking the dayroom door.

One of the other detention-facility residents, R.M., testified that M.L.H. had requested feminine hygiene products from Tate, but that Tate took approximately two hours to bring the hygiene cart into the dayroom, and did not bring any feminine hygiene products with her. For her part, Tate testified that she did not recall anyone making a request for feminine hygiene products.

While Tate was handing another resident her hygiene bag, M.L.H. attempted to grab her own bag from the cart. Tate told M.L.H. not to touch anything on the cart, and proceeded to distribute the other hygiene bags and put the residents in their cells for the night. While Tate was putting another resident in her cell, M.L.H. pushed the hygiene cart over. Tate tried to give M.L.H. her hygiene bag and put her in her cell, but M.L.H. repeatedly refused to go in.

Tate closed M.L.H.'s cell door and attempted to exit the dayroom. M.L.H. blocked the dayroom door and the intercom console, preventing Tate from exiting or summoning help. Tate asked M.L.H. to move, but she refused. When M.L.H. did not move out of the way following Tate's second request, Tate pushed M.L.H. to the

3

side to gain access to the door and intercom. When Tate pushed M.L.H., she had one hand near M.L.H.'s head and another on her arm.

In response to being pushed, M.L.H. grabbed Tate's hair and began punching her in the head and in the ribs. Tate grabbed M.L.H.'s hair, stating it "was the only way [she] could try to get [M.L.H.] to stop." Tate testified that at some point, someone in the control room must have opened the dayroom door because she and M.L.H. fell through the door into the hallway. M.L.H. was then on top of Tate, still punching her, and banging Tate's head on the ground. Tate testified that M.L.H. "wouldn't get off me. She kept telling me to let go of her hair, but I told her to let go of my hair." M.L.H. "let go of [Tate's] hair[,] all while still punching [her]." Tate attempted to get out from under M.L.H., but was unsuccessful. Ultimately, another resident, D.S., was let out of her cell, and pulled M.L.H. off of Tate.

Following the altercation, Tate had pain in her back and ribs, bruising, a headache that lasted multiple days, and a swollen eye.

A surveillance video of the altercation was admitted in evidence at the adjudication hearing.

The circuit found the allegations of Counts I-III of the Juvenile Officer's motion to modify were true, and set a disposition hearing for the next day. After the disposition hearing, the court ordered that M.L.H. be committed to the Buchanan County Academy.

M.L.H. appeals. While this appeal was pending, M.L.H. was released from the Buchanan County Academy, and placed on probation.

### Discussion

### I.

We first consider the Juvenile Officer's claim that M.L.H.'s appeal is moot, because M.L.H. has been released from the juvenile detention facility and placed on probation.

4

While M.L.H.'s appeal was pending, the Juvenile Officer filed a request for M.L.H.'s release in March 2021. The circuit court granted the motion, and M.L.H. was released from the detention facility, placed in her legal guardian's custody, and put on probation supervised by the Juvenile Officer.

"An issue is moot if our resolution of a matter on appeal in the appellant's favor would have no practical effect." *Westcott v. State*, 361 S.W.3d 468, 472 (Mo. App. W.D. 2012) (citation omitted). "When an event occurs that makes a decision on appeal unnecessary or makes it impossible for the appellate court to grant effectual relief, the appeal is moot and generally should be dismissed." *STRCUE, Inc. v. Potts*, 386 S.W.3d 214, 218 (Mo. App. W.D. 2012) (citation omitted)

Although M.L.H. has been released from the juvenile detention facility, due to the circuit court's adjudication she remains subject to the jurisdiction of the court, and is on supervised probation. The fact that M.L.H. remains on probation and supervision prevents this appeal from becoming moot, because a decision in M.L.H.'s favor would have the effect of freeing her from the restrictions and supervision which are incidents of her probation. *See In re G.D.G.*, 485 S.W.2d 449, 452 (Mo. App. 1972); *cf. State ex rel. Nixon v. Kelly*, 58 S.W.3d 513, 515 n.2 (Mo. 2001) (finding that an appeal was not moot where the defendant was on parole, which could be revoked). Further, even if M.L.H. were no longer subject to supervision, a live controversy would nevertheless exist due to "the discredit and stigma associated with [M.L.H.'s] record of adjudication," and the potential future consequences of that adjudication. *D.C.M. v. Pemiscot Cnty. Juv. Office*, 578 S.W.3d 776, 781-82 (Mo. 2019).

## II.

In her first Point, M.L.H. argues that the circuit court erred in finding that she committed acts which would constitute fourth-degree assault, because the court applied an erroneous interpretation of "recklessness." M.L.H. argues a

5

determination of "recklessness" required a subjective inquiry into her "specific circumstances" – in this case, Tate's refusal to supply M.L.H. with feminine hygiene products, as well as M.L.H.'s past childhood trauma. The circuit court rejected M.L.H.'s arguments, explaining that

> "recklessly" is not based on [a] subjective standard. It's based on a reasonable person standard, . . . what a reasonable person would [do] at 14 years old. I don't think a reasonable person 14 years old, applying that standard, in juvenile detention being told by a staff member to remove themselves from the doorway . . . that they have the right then when they're physically trying to move them so that the staff member can either call for help or leave the dayroom that that justifies her assaulting the staff member.

"Juvenile proceedings are reviewed 'in the same manner as other court-tried cases.'" *D.C.M*, 578 S.W.3d at 786 (citation omitted). "We will, therefore, affirm a judgment in a juvenile proceeding 'unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law.'" *I.D. v. Juv. Officer*, 611 S.W.3d 869, 873 (Mo. App. W.D. 2020) (citation omitted). "This Court applies *de novo* review to questions of law decided in court-tried cases," as well as to the application of the law to facts. *Pearson v. Koster*, 367 S.W.3d 36, 43-44 (Mo. 2012). We will defer to the trial court's factual determinations. *Id*. at 44.

"A person commits the offense of assault in the fourth degree if: (1) The person attempts to cause or recklessly causes physical injury, physical pain, or illness to another person[.]" § 565.056.1. "A person 'acts recklessly' or is reckless when . . . she consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." § 562.016.4.

The definition of "recklessness" in § 562.016.4 has two components: (1) the actor must "consciously disregard[ ] a substantial and unjustifiable risk . . . that a

6

result will follow"; and (2) that disregard must "constitute[ ] a gross deviation from the standard of care which a reasonable person would exercise in the situation."

The *first* part of the definition of "recklessness" is plainly *subjective*, since it requires that an actor "consciously disregard" a risk. In this respect, the Missouri Supreme Court has explained that "[r]ecklessness resembles knowing conduct in one respect in that it involves awareness, but it is an awareness of risk, that is, of a probability less than a substantial certainty." *State v. Belton*, 153 S.W.3d 307, 309 (Mo. 2005) (citation omitted). Thus, the first prong of recklessness requires that the actor have had subjective awareness of the risks associated with her conduct, yet nonetheless proceeded to act. In this case, there is no indication that the circuit court did not require the State to prove that M.L.H. actually, consciously disregarded the risk that her actions would cause physical pain to Tate.

While the first part of the definition of "recklessness" may be subjective, the *second* component of the definition of "recklessness" plainly involves an *objective* standard: it invokes "the standard of care which *a reasonable person* would exercise." § 562.016.4 (emphasis added). In *I.D. v. Juvenile Officer*, 611 S.W.3d 869 (Mo. App. W.D. 2020), we held that "recklessness under Section 562.016.4 . . . requires a gross deviation [from] a reasonable person's standard of care." *Id.* at 876. With respect to children, we explained that "the children's standard of care is that of a child of 'the same age, capacity, and experience.'" *Id.* (quoting *Mantia v. Mo. Dept. of Transp.*, 529 S.W.3d 804, 810 (Mo. 2017)). While *I.D.* held that the standard of care applicable to minors must take account of the child's "age, capacity, and experience," we never suggested that the standard was subjective, rather than the objective "reasonable person" test specified in § 562.016.4.

In the passage from the transcript we have quoted above, the circuit court was discussing the "reasonable person" standard of care from which M.L.H.'s conduct had to deviate. The quoted statement merely explained that the relevant

7

standard of care was measured objectively based on how a hypothetical child of the same age would react in the same circumstances, _not_ based on M.L.H.'s own subjective, individualized knowledge and experience.

The circuit court's interpretation of "recklessness" is supported by the Supreme Court's decision in *Mantia*, on which we relied in *I.D.* *Mantia* involved a worker's compensation statute which allowed recovery for work-related stress only if the stress "was extraordinary and unusual," "measured by objective standards." § 287.120.8. The Court explained:

> An objective standard is "[a] legal standard that is based on conduct and perceptions external to a particular person." An objective standard contrasts with a subjective standard, which is defined as, "A legal standard that is peculiar to a particular person and based on the person's individual views and experiences."
>
> . . . .
>
> This Court long has held in tort cases, "'The standard of conduct exacted by the law is an external and objective standard * * *,' and not the personal, individual, subjective standard of the actor involved."
>
> . . . .
>
> Further, in cases involving unusual plaintiffs with specialized standards of care, the MAI provides additional guidance. MAI 11.04 states that when the plaintiff is a minor, the jury should be told, "The term 'negligent' or 'negligence' as used in this [these] instruction[s] with respect to [plaintiff] . . . means the failure to use that degree of care which an ordinarily careful [boy] [girl] of the same age, capacity and experience would use under the same or similar circumstances."
> . . . .
>
> Accordingly, the objective standard for determining whether Employee's stress was compensable is whether the same or similar actual work events would cause a reasonable highway worker extraordinary and unusual stress. Such evidence might be introduced through the testimony of other highway workers as to the circumstances that are experienced as part of the job in general, but individualized, subjective reactions to those circumstances are irrelevant.

529 S.W.3d at 809-10 (citations omitted).

8

Although the objective "reasonable person" standard of care applicable in this case must take account of certain of M.L.H.'s generalized characteristics (such as her age and mental capacity), the standard is _not_ based on her particular, individual life history. Consistent with *I.D.* and *Mantia*, the circuit court correctly held that in determining whether M.L.H. had grossly deviated from the relevant standard of care, her "individual views and experiences," or her "individualized, subjective reactions to [her] circumstances," did not supply the relevant test. The court instead explained that the standard of care must be gauged by how a hypothetical, reasonable 14-year-old child would act when facing similar circumstances (housed in a juvenile detention facility, and responding to directives from facility staff). The circuit court concluded that M.L.H. grossly deviated from what a reasonable 14-year-old in her circumstances would do, when she repeatedly struck Tate in the head with her fists, and beat Tate's head into the floor, in response to Tate's attempt to move M.L.H. aside so that Tate could exit the dayroom or summon help. This conclusion was eminently supported by the evidence, and does not involve a misapplication of the law.

Point I is denied.

## II.

In Point II, M.L.H. argues that the circuit court erred in finding that the allegation of fourth-degree assault was true, because the court's determination that the State had negated self-defense was against the weight of the evidence.

> "[A] claim that the judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment." In other words, "weight of the evidence" denotes an appellate test of how much persuasive value evidence has, not just whether sufficient evidence exists that tends to prove a necessary fact.

*Ivie v. Smith*, 439 S.W.3d 189, 205–06 (Mo. 2014) (citations omitted). "A circuit court's judgment is against the weight of the evidence only if the circuit court could

9

not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment." *Id.* at 206.

We view the evidence in the light most favorable to the circuit court's judgment. *Day v. Hupp*, 528 S.W.3d 400, 411 (Mo. App. E.D. 2017). "[T]his Court defers to the circuit court's findings of fact when the factual issues are contested and when the facts as found by the circuit court depend on credibility determinations." *Ivie*, 439 S.W.3d at 206. The circuit court is free to believe all, some, or none of the evidence offered. *Id.* However, "[e]vidence not based on a credibility determination, contrary to the circuit court's judgment, can be considered in an appellate court's review of an against-the-weight-of-the-evidence challenge." *Id.*

"The against-the-weight-of-the-evidence standard serves only as a check on a circuit court's potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong." *Id.* We must act with caution when exercising the power to set aside a decree or judgment on the ground that it is against the weight of the evidence. *JAS Apartments, Inc. v. Naji*, 354 S.W.3d 175, 182 (Mo. 2011).

Based on the evidence presented (including the surveillance footage of the altercation), the circuit court found that Tate directed M.L.H. to enter her cell. M.L.H. not only refused to enter her cell, but blocked Tate's exit from the dayroom. The court found that Tate initiated physical contact when she attempted to push M.L.H. out of the doorway. The court also found, however, that M.L.H. then "escalated" the interaction to "striking" and "assault," hitting Tate "numerous times" with her fist while sitting on top of Tate. The court found that a reasonable fourteen-year-old in juvenile detention, having refused an order by a staff member to remove herself from the doorway, was not "justifie[d in] assaulting the staff member" when the staff member attempted to physically move the juvenile from the

10

door. While Tate was holding onto M.L.H.'s hair throughout the assault, the court found that was insufficient to "justif[y] assault."

The justification of self-defense requires that a defendant's use of force have been reasonable, in relation to the threat that the defendant faces. Section 563.031.1 provides that "[a] person may . . . use physical force upon another person when and to the extent . . . she reasonably believes such force to be necessary to defend . . . herself . . . from what . . . she reasonably believes to be the use or imminent use of unlawful force by such other person." Reasonable belief means "a belief based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief." *State v. Whipple*, 501 S.W.3d 507, 517 (Mo. App. E.D. 2016) (citation omitted). A defendant is not entitled to claim self-defense if she "use[s] more force than that which appears reasonably necessary." *State v. Crudup*, 415 S.W.3d 170, 175 (Mo. App. E.D. 2013); *see also State v. Williams*, 815 S.W.2d 43, 48 (Mo. App. W.D. 1991) ("In order to claim self-defense, the defendant . . . must not use more force than that which appears reasonably necessary[.]"). Once a juvenile has injected the issue of self-defense, the juvenile officer has the burden of proving a lack of self-defense beyond a reasonable doubt. *See Bruner*, 541 S.W.3d at 530.

Even if Tate was the first to use physical force by attempting to push M.L.H. aside, and M.L.H. was therefore not the initial aggressor, the circuit court was fully justified in concluding that M.L.H.'s use of force was unreasonable in the circumstances. The video recording admitted in evidence is clear and captures the entire incident. The video, and Tate's testimony, indicate that M.L.H. stood in front of the dayroom door and intercom, preventing Tate from leaving. After M.L.H. refused to allow Tate to exit, Tate approached M.L.H. and attempted to push M.L.H. out of the way, by shoving against M.L.H.'s head and arm. M.L.H. used her left hand to swat Tate's hands away, while using her right hand to hit Tate in the

11

head.  Tate responded by throwing both of her hands in M.L.H.'s direction (in what appears to be an attempt to distance herself from M.L.H.).  M.L.H. then grabbed Tate by the hair, swung Tate down and around to the left, and began punching Tate in the head and upper body.  Tate grabbed M.L.H.'s hair while M.L.H. was still punching her, but did not otherwise strike back.  M.L.H.'s assault of Tate lasted over 3 minutes, during which M.L.H. sat on top of Tate multiple times and slammed her head against the ground.

From the video evidence and Tate's testimony, it was not unreasonable for the court to find that M.L.H. "use[d] more force than that which appear[ed] reasonably necessary" in escalating the altercation from shoving to the repeated, relentless punching of Tate's head and upper body.  Even though Tate may have been the initial aggressor by trying to push M.L.H. out of the way, the court could reasonably find that M.L.H. did not reasonably believe that Tate intended to imminently engage in any further use of force.  Although Tate may have grabbed M.L.H.'s hair as the assault progressed, the court was justified in concluding that this did not justify M.L.H.'s assault itself.  Further, the court could reasonably find that the *amount* of force M.L.H. employed was unreasonable, and a disproportionate response to Tate's attempt to get M.L.H. to step aside.

The court's finding that M.L.H. was not acting in self-defense was not against the weight of the evidence.  Point II is denied.

### III.

In her final Point, M.L.H. argues the circuit court erred in finding M.L.H. delinquent for committing the offense of tampering with electronic monitoring equipment, because there was insufficient evidence from which the court could find that M.L.H. had been required by court order to wear electronic monitoring equipment.

12

"For a sufficiency of the evidence challenge, '[t]he evidence, including all reasonable inferences therefrom, is considered in the light most favorable to the judgment, disregarding all contrary inferences.'" *D.C.M.*, 578 S.W.3d at 786 (citation omitted). We ask "only whether there was sufficient evidence from which the trier of fact reasonably could have found the [juvenile] guilty." *State v. Claycomb*, 470 S.W.3d 358, 362 (Mo. 2015) (citation omitted). "When a juvenile is alleged to have committed an act that would be a criminal offense if committed by an adult, the standard of proof, like that in criminal trials, is beyond a reasonable doubt." *D.C.M.*, 578 S.W.3d at 786 (citation omitted).

"A person commits the offense of tampering with electronic monitoring equipment if . . . she intentionally removes, alters, tampers with, damages, or destroys electronic monitoring equipment which a court, the division of probation and parole or the parole board has required such person to wear." § 575.205.1.

The only evidence presented at the adjudication hearing as to this allegation was through the testimony of M.L.H.'s legal guardian, her aunt. M.L.H.'s aunt testified that M.L.H. had previously been required to wear an electronic monitoring bracelet. When M.L.H.'s aunt last saw her before she was reported as a runaway on September 3, 2020, M.L.H. was wearing the monitoring bracelet. When M.L.H. was found on September 9, 2020, she was no longer wearing the bracelet, and told her aunt that the bracelet had been cut off; M.L.H. also told her aunt the general area where the bracelet could be found. Though the court had provided in its August 24, 2020 order that M.L.H. remain in the electronic monitoring program, the Juvenile Officer did not introduce that order into evidence, nor request that the court take judicial notice of it.

In finding M.L.H. had committed the offense of tampering with electronic monitoring equipment, the court stated:

13

The evidence showed that [M.L.H.] was equipped with electronic monitoring, that she was on electronic monitoring, and that she was discovered six days after she left her placement with that item removed and in fact stated that it was removed and made a statement where it was placed.

And so the Court does believe the logical inference is that she removed it or had it removed by somebody else with her consent.

M.L.H. argues that her aunt's testimony alone was insufficient to prove that M.L.H. had been ordered by a court to wear electronic monitoring equipment. M.L.H. also emphasizes that the Juvenile Officer did not offer into evidence any court order directing M.L.H. to wear electronic monitoring equipment, or request that the court take judicial notice of such an order. M.L.H. cites caselaw holding that, "when the record *in another case* forms an essential element of a party's claim or defense, then the record itself must be introduced in evidence, absent an admission of its contents by the opposing party." *In re J.M.*, 328 S.W.3d 466, 469 (Mo. App. E.D. 2010) (citation omitted; emphasis added). *J.M.* also explains that, "under circumstances where a trial court, on its own motion, may take judicial notice of its records *in another case*, . . . the court should disclose on the record the precise matters so considered." *Id.* (citation omitted; emphasis added).

The order requiring M.L.H. to comply with electronic monitoring was not taken from "another case," however – that order was entered in the present case. M.L.H. cites no authority holding that records from the very case being tried must be formally introduced into evidence, or must be the subject of a formal request to take judicial notice. Caselaw indicates that such formality is not required where the court considers records of earlier proceedings in the same case. *See*, *e.g.*, *Cologna v. Farmers & Merchants Ins. Co.*, 785 S.W.2d 691, 698-99 (Mo. App. S.D. 1990) ("while motions for summary judgment generally must be supported by affidavits, such authentication is not necessary when courts take notice of their own prior proceedings"); *Hawkins v. Hawkins*, 462 S.W.2d 818, 826 (Mo. App. 1970)

14

(while "courts generally will not notice the records and facts in one action in deciding another and different one, it is well established that they can and do take notice of their entire record and the facts established thereby in a particular case, or, as some courts say, the trial court has notice of the entire record in the cause presently before it"; citations omitted).

M.L.H. cites to *B.O. v. Juvenile Officer*, 595 S.W.3d 506 (Mo. App. W.D. 2020), to argue that the Juvenile Officer's motion to modify M.L.H.'s disposition should be treated as separate from the proceeding in which she was initially found to be delinquent and brought under the court's jurisdiction. In *B.O.*, this Court recognized that, although "motions to modify were not historically used to adjudicate new allegations . . . . '[n]ow, motions to modify are often also used to provide a forum for an adjudication of the juvenile's guilt of additional crimes occurring while the juvenile was under the court's jurisdiction.'" *Id.* at 512 (quoting *C.L.B. v. Juv. Officer*, 22 S.W.3d 233, 239 (Mo. App. W.D. 2000)). We held in *B.O.* and *C.L.B.* that, where a motion to modify is used to determine whether a juvenile has committed additional criminal offenses, certain of the procedures used in initial adjudications must be applied (such as the proof-beyond-a-reasonable-doubt standard, and the statutory right to a separate dispositional hearing). However, although *B.O.* and *C.L.B.* require that motion-to-modify proceedings adhere to heightened procedural standards in certain cases, they do not suggest that the motion-to-modify proceeding amounts to a *separate civil action* from the proceeding in which the juvenile was originally brought under the circuit court's jurisdiction. Indeed, in both *B.O.* and *C.L.B.*, this Court *endorsed* the use of a motion to modify a prior disposition order, rather than the filing of a new delinquency petition, to determine whether the juvenile had committed additional offenses while under the court's jurisdiction (so long as certain procedural safeguards were employed). Notwithstanding the holdings in *B.O.* and *C.L.B.*, the court's reliance on its own

15

prior orders in this case presents none of the notice or authenticity concerns which may be present when a court takes judicial notice of records from an entirely separate judicial proceeding.

Because the order requiring M.L.H. to submit to electronic monitoring was entered by the same judge, in the same case, in which the allegation of tampering with monitoring equipment was being adjudicated, the Juvenile Officer was not required to introduce the court's prior order into evidence, or formally request that the court take judicial notice of that order. Given the court's prior order that M.L.H. wear electronic monitoring equipment, and her aunt's testimony that M.L.H. had been wearing such equipment, but returned home without it, and told her aunt that it had been cut off and left elsewhere, there was sufficient evidence from which the circuit court could substantiate the allegation of tampering with electronic monitoring equipment.

Point III is denied.

### Conclusion

The judgment of the circuit court is affirmed.

_____
Alok Ahuja, Judge

All concur.

16