GARY W. LYNCH, J.
Eight days before her death, Betty Killian amended the Betty J. Killian Revocable Trust (referred to as "Betty's Trust" or "her Trust") to remove her son, Joseph ("Joe") Killian, as a beneficiary, thereby leaving the entirety of her Trust estate to her other son, William ("Bill") Killian.[1] Following Betty's death, Joe filed a petition against the Trust Company of the Ozarks[2] and Bill (in their capacities as co-trustees of Betty's Trust and in Bill's individual capacity) (collectively referred to as "Respondents"), seeking to reform the terms of Betty's Trust to restore him as a beneficiary. As relevant here, Count III of Joe's petition alleged that reformation was proper because the terms of Betty's Trust were affected by her mistaken belief that Joe never paid his late father, Robert ("Bob") Killian, for the purchase of Springfield Development Company ("SDC"), one of the Killian family's businesses. See section 456.4-415.[3] The trial court denied Joe relief on Court III of his petition following a bench trial, finding in its judgment that Joe "has not proved by clear and convincing evidence that Betty was mistaken in her belief that Joe paid nothing for SDC[.]" Joe appeals, claiming that this trial court factual finding is against the weight of the evidence. Finding no merit in this claim, we affirm.
Factual and Procedural Background [4]
Bob created several businesses during the course of his lifetime. One was *414 R&B Limited Partnership ("the Partnership"), which he co-owned with Betty. At its inception, the Partnership, Joe, and Bill each owned and controlled a one-third interest in SDC. Bill later relinquished his interest in SDC when he purchased Bob's and Joe's interests in Killian Construction Company ("KCC"), another one of the Killian family's businesses. After the KCC sale to Bill, the Partnership and Joe each owned and controlled fifty percent of SDC.[5]
In 2012, Bob determined he wanted out of SDC. After several months of negotiations, on July 24, 2012, Joe paid $500,000 in cash for the Partnership's 50% interest in SDC. In addition, three outstanding SDC debts that were owed to Bob and Betty in the approximate sum of $642,000 ("the SDC notes") were forgiven. Bob had been receiving approximately $35,000 in interest on these notes each year. After the closing of the sale of SDC to Joe, these notes were deemed satisfied, and the interest payments to Bob stopped.
During the negotiations leading up to the SDC sale, Bob estimated the equity in SDC at $4 million and suggested to Joe that some of the SDC notes should remain in effect following the sale. On June 2, 2012, Joe met with his parents to discuss the matter. He produced a fax outlining his proposed basic terms and conditions of the SDC sale agreement and asked his parents to sign their assent to it. Bob agreed, stating that he was signing over "1.5, 2 million dollars on my part" and "that's how bad I want out." Betty, who the trial court found "was quite sharp about business matters[,]" was reluctant to sign but ultimately did so. Privately, Joe told Betty that he knew $500,000 was not the "full amount," meaning the "full value" presumably, and that he did not think that "[D]ad would ever agree to it."
After the SDC sale, Bob often complained that he had been "rookie-dooed" or cheated by Joe and discussed disinheriting him. Bob died on November 15, 2015, leaving all of his assets to Betty.
On March 2, 2016, Betty met with her lawyer, Don Duncan, about amending her Trust to disinherit Joe. Mr. Duncan thereafter drafted the First Amendment to the Complete Restatement of the Revocable Living Trust Agreement of Betty J. Killian dated May 17, 2013 ("the Trust Amendment"). The Trust Amendment stated, in relevant part, "Settlor directs that the residue of the trust estate be distributed to her son William F. Killian, per stirpes[.]"
On March 9, 2016, Betty met with Mr. Duncan and a bank employee at Oak Star Bank and signed the Trust Amendment. During this meeting, she mentioned to those present that the Trust Amendment was to even things up for Bill. Additionally, Betty asked Mr. Duncan to help her draft a letter to Joe that would explain her reason for removing him as a beneficiary of the Trust. When Mr. Duncan asked Betty what she wanted to say in the letter, Betty told him that she wanted to be fair *415 to both Joe and Bill, and to be fair to both of them she had amended her Trust. Mr. Duncan went back to his office, prepared a typed draft of a proposed letter to Joe, and delivered it to Betty at her home that afternoon ("the Duncan draft") (admitted at trial as "Petitioner's Exhibit 7" and included in the appendix to this opinion). As they discussed the letter to Joe, Betty wanted to add "Your Dad and I talked about this, and this was his idea as well as mine[,]" which Mr. Duncan handwrote on the Duncan draft below the typed words. Mr. Duncan suggested to Betty that she hand-write the letter to Joe. When Mr. Duncan left her home around 4:15 p.m. that afternoon, Betty appeared to him to be fine.
After Mr. Duncan left her home, Betty began to hand-write a draft of a letter to Joe ("Betty's draft" or "her draft") (admitted at trial as "Petitioner's Exhibit 8" and included in the appendix to this opinion). Bill, who was out of state at the time, happened to talk with Betty by phone while she was working on her draft and became concerned with how Betty sounded. Bill asked his wife, Lisa, to check on Betty. Lisa went over to Betty's house and found her unconscious. Betty was taken to the hospital by ambulance. Betty never completed her draft or finalized a letter to Joe because while writing her draft, she suffered a stroke from which she did not recover before her death eight days later on March 17, 2016. At the time of Betty's death, the balance of her Trust estate was worth approximately $2 million.
Joe filed suit to invalidate the Trust Amendment. Count III of his petition asserted a mistake of fact pursuant to section 456.4-415, in that Betty allegedly executed the Trust Amendment under the mistaken belief that Joe "owed [the] Partnership payment for a 50% interest in [SDC]." At trial, Joe relied almost exclusively upon the Duncan draft and Betty's draft to prove that Betty was mistaken in her belief that Joe paid nothing for the purchase of SDC and that this mistaken belief caused her to amend her trust excluding Joe as a beneficiary.
The trial court ultimately denied Joe relief, finding that
The court finds that [Joe] has not proved by clear and convincing evidence that Betty was mistaken in her belief that [he] paid nothing for SDC and this mistaken belief caused Betty to amend her trust. The court believes that Betty and Bob talked before his death and they had decided to remove Joe as a beneficiary to even things up. It was quite clear that Bob thought he had gotten cheated in the sale of SDC to Joe and wanted to remove Joe as a beneficiary of his estate. As Don Duncan told Joe, he died before he could get that done so it appears that Betty amended her trust to honor Bob's wishes.
Joe timely appeals claiming in one point relied on that
[t]he trial court erred in granting Judgment in favor of [Respondents] on Count III of [his] Petition, because the trial court's Judgment was against the weight of the evidence , in that the undisputed and agreed upon evidence offered by [him] at trial clearly and convincingly establishes [he] paid $500,000.00 to purchase [Joe]'s ownership interest in [SDC], that Betty[ ] was mistaken about this fact, and that she changed the terms of [her] Trust to remove [him] as a beneficiary as a direct result of that mistake of fact.
(Emphasis added).
Standard of Review
"On review of a court-tried case, an appellate court will affirm the circuit court's judgment unless there is no substantial *416 evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." Ivie v. Smith , 439 S.W.3d 189, 198-99 (Mo. banc 2014) (citing Murphy v. Carron , 536 S.W.2d 30, 32 (Mo. banc 1976) ).
Appellate courts act with caution in exercising the power to set aside a decree or judgment on the ground that it is against the weight of the evidence. JAS Apartments, Inc. v. Naji , 354 S.W.3d 175, 182 (Mo. banc 2011). "[A] claim that the judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment." In re J.A.R. , 426 S.W.3d 624, 630 (Mo. banc 2014). In other words, "weight of the evidence" denotes an appellate test of how much persuasive value evidence has, not just whether sufficient evidence exists that tends to prove a necessary fact. See White v. Dir. of Revenue , 321 S.W.3d 298, 309 (Mo. banc 2010) (stating that "weight" denotes probative value, not the quantity of the evidence). The against-the-weight-of-the-evidence standard serves only as a check on a circuit court's potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong. See JAS Apartments, Inc. , 354 S.W.3d at 182.
When reviewing the record in an against-the-weight-of-the-evidence challenge, this Court defers to the circuit court's findings of fact when the factual issues are contested and when the facts as found by the circuit court depend on credibility determinations. See Pearson v. Koster , 367 S.W.3d 36, 43-44 (Mo. banc 2012) ; White , 321 S.W.3d at 307-09. A circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment. See Pearson , 367 S.W.3d at 43-44 ; White , 321 S.W.3d at 307-09. When the evidence poses two reasonable but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence. In re J.A.R. , 426 S.W.3d at 626, 632 n. 14 ; Pearson , 367 S.W.3d at 43-44 ; White , 321 S.W.3d at 307-09.
This Court defers on credibility determinations when reviewing an against-the-weight-of-the-evidence challenge because the circuit court is in a better position to weigh the contested and conflicting evidence in the context of the whole case. In re J.A.R. , 426 S.W.3d at 626. The circuit court is able to judge directly not only the demeanor of witnesses, but also their sincerity and character and other trial intangibles that the record may not completely reveal. Id. at 627. Accordingly, this standard of review takes into consideration which party has the burden of proof and that the circuit court is free to believe all, some, or none of the evidence offered to prove a contested fact, and the appellate court will not re-find facts based on credibility determinations through its own perspective. Id. ; Pearson , 367 S.W.3d at 43-44. This includes facts expressly found in the written judgment or necessarily deemed found in accordance with the result reached. Rule 73.01(c); In re J.A.R. , 426 S.W.3d at 626. Evidence not based on a credibility determination, contrary to the circuit court's judgment, can be considered in an appellate court's review of an against-the-weight-of-the-evidence challenge.
Ivie , 439 S.W.3d at 205-06.
Discussion
Joe claims that the trial court's finding that he "has not proved by clear *417 and convincing evidence that Betty was mistaken in her belief that Joe paid nothing for SDC" is against the weight of the evidence.[6] Joe implicitly recognizes and acknowledges that, as an elemental fact of his section 456.4-415 claim for reformation, he bore the burden to clearly and convincingly prove to the trial court that at the time Betty executed the Trust Amendment she was laboring under a mistaken factual belief that Joe paid nothing for SDC. See section 456.4-415.[7] Quoting R & R Land Dev., L.L.C. v. Am. Freightways, Inc. , 389 S.W.3d 234, 239 (Mo. App. S.D. 2012), Joe also concedes that " '[r]elief based on a claim that the trial court's judgment against the party having the burden of proof is against the weight of the evidence is rarely granted.' " See also , Hurricane Deck Holding Co. v. Spanburg Invs., LLC , 548 S.W.3d 390 (Mo. App. S.D. 2018) ; Black River Elec. Coop. v. People's Cmty. State Bank , 466 S.W.3d 638 (Mo. App. S.D. 2015).
Nevertheless, Joe proceeds to assert that this case "presents an exception to the general rule, in that [1] credibility was not at issue, [2] there were no inferences that were required to have been made, and [3] the evidence presented to the trial court was 'conclusive' as to the only issue presented." Based upon these three premises, Joe then argues that, given the trial court's factual finding that Joe paid $500,000 for the Partnership's ownership interest in SDC, the phrase "Bill paid us for the business assets that came to him by this division and you did not " (emphasis added) in the Duncan draft was a "statement of fact by Betty Killian [that was] false, and she was unquestionably mistaken about it[,]" and the phrase "Dad did not get paid one dime after we sign (sic) the paper" in Betty's draft was a "statement of fact by Betty Killian [that was] demonstrably false and she was unquestionably mistaken." We disagree and determine that all three of the premises upon which Joe bases his argument are incorrect, thereby rendering his against-the-weight-of-the-evidence argument flawed and meritless.
First, credibility was at issue. The elemental fact as to whether Betty held a mistaken factual belief that Joe paid nothing for SDC at the time she signed the Trust Amendment was a contested fact. "[A] party can contest the evidence in many ways, such as by putting forth contrary evidence, cross-examining a witness, challenging the credibility of a witness, pointing out inconsistencies in evidence, or arguing the meaning of the evidence." Pearson v. Koster , 367 S.W.3d 36, 44 (Mo. banc 2012) (internal quotation marks and citations omitted). During the trial, Respondents employed all of these methods to contest this elemental fact. In that context, Mr. Duncan's testimony related to the Duncan draft, attribution of statements in the Duncan draft to Betty and characterizing the statements in Betty's draft as an accurate reflection of her state of mind were all subject to the trial court's credibility determinations. The trial court was "free to believe all, some, or none of the evidence offered to prove" this contested elemental fact. Ivie , 439 S.W.3d at 206.
*418 The trial "court is in a better position to weigh the contested and conflicting evidence in the context of the whole case." Id. An "appellate court will not re-find facts based on credibility determinations through its own perspective. Id.
Second, the trial court could not make a determination whether Betty held a mistaken factual belief that Joe paid nothing for SDC without drawing inferences from the evidence, which was all circumstantial. Indeed, Joe's argument itself contradicts his expressed statement, "there were no inferences that were required to have been made," by implicitly relying upon numerous inferences. For example, based upon testimony that Betty talked to Mr. Duncan about why she wanted to disinherit him, Joe infers that she precisely articulated her exact state of mind on this issue to Mr. Duncan, that Mr. Duncan accurately and completely comprehended and understood her state of mind, that Mr. Duncan accurately captured and translated Betty's state of mind in the language he chose to use in the Duncan draft, and that once she had the opportunity to read the Duncan draft Betty agreed that it accurately reflected her state of mind and adopted it as her statement that Joe paid nothing for SDC. Similarly, Joe infers that Betty's references to "papers" and "paper" in Betty's draft referred only to the single paper signed by the parties on June 2, 2012, during their negotiations and before the closing, when Joe paid the purchase price. While not expressly stated or otherwise acknowledged in his argument, Joe nevertheless relies upon each and every one of these inferences to support his position, contrary to the judgment, that Betty held a mistaken belief that Joe paid nothing for SDC.
On the other hand, there are reasonable inferences the trial court could have drawn that are favorable to its judgement. Based upon the facts that Betty's draft adopted some wording from the Duncan draft, but in mentioning Bill's payment for KCC omitted the phrase "and you did not[,]" the trial court could have reasonably inferred that Betty considered Mr. Duncan's use of that phrase, but rejected it because she knew it was not factually accurate in that she was well aware Joe paid $500,000 for the Partnership's interest in SDC. Likewise, the trial court could have reasonably inferred that the references to signed "papers" and "paper" in Betty's draft referred to the SDC closing papers signed on July 24, 2012, and that "Dad did not get paid one dime after" referred to the fact that after that closing date Bob did not get any more interest payments on the SDC notes that were forgiven. "When the evidence poses two reasonable but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence." Id.
Third, because the circumstantial evidence at trial gave rise to competing inferences, that evidence did not and could not conclusively establish that Betty mistakenly believed that Joe paid nothing for SDC.
Joe's against-the-weight-of-the-evidence argument, based upon three incorrect premises, is necessarily flawed. It is, therefore, analytically useless, see Houston v. Crider , 317 S.W.3d 178, 189 (Mo. App. S.D. 2010), and provides no basis for us to form "a firm belief that the ... judgment is wrong[,]" Ivie , 439 S.W.3d at 206. Accordingly, Joe's point is denied.
Decision
The trial court's judgment is affirmed.
DON E. BURRELL, JR., P.J. - concurs
NANCY STEFFEN RAHMEYER, C.J. - concurs
APPENDIX
*419 PETITIONER'S EXHIBIT 7
Dear Joe
First, let me say that I do love you very much, and I do appreciate all that you do for me including your calls to check on me. You and your brother both mean very much to me.
Since Dad died I have been going over things, including what some people call estate planning. Also, since Dad named me as his trust beneficiary, I have consolidated Dad's and my assets into my trust in order to make things more simple for me to manage.
In order to be completely up front with you, I want you to know that my trust does not name you as a beneficiary. And I want you to know why.
Some time ago Dad divided out business and commercial assets between you and Sill. Bill paid us for the business asset that came to him by this division, and you did not That meant that you received your share of our estate at that time. Bill did not.
We can't go back and do things over, so the only thing that I know to do in order to make things more even between you and your brother is to do as I have done. That is to make Bill the beneficiary of my trust assets, which Includes those assets which came to me by reason of Dad's trust.
I hope you understand that what I have done is not by reason of any lack of love for you or preference for your brother. My only reason is to do what I can to make you and Bill as equal as I can in the distribution of Dad's and my financial assets.
Your Dad and I talked about this, and this was his idea as well as mine.
*420 PETITIONER'S EXHIBIT 8 *421 --------

Throughout this opinion we refer to members of the Killian family by their first names (or nicknames as is the case with Joe, Bill, and Bob, which is how they are identified in the parties' briefs and in the trial court's judgment). The use of first names or nicknames is strictly for the purpose of clarity and ease of reference. No familiarity or disrespect is intended.

After the petition was filed, Trust Company of the Ozarks merged into Simmons Bank.

Section 456.4-415, RSMo Cum.Supp. 2004 provides
The court may reform the terms of a trust, even if unambiguous, to conform the terms to the settlor's intention if it is proved by clear and convincing evidence that both the settlor's intent and the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement.

Respondents argue in their brief that Joe's statement of facts violates Rule 84.04, in that he fails to present this court with certain facts that support the trial court's judgment. We agree with Respondents. "An appellant's failure to provide a fair and concise statement of facts is a sufficient basis to dismiss an appeal." U.S. Bank National Ass'n v. Christensen , 541 S.W.3d 16, 19 (Mo. App. E.D. 2018). Because Joe's factual omissions do not substantially hamper our ability to discern the facts, we review his point ex gratia. All rule references are to Missouri Rules of Court (2017).

The record on appeal contains many instances where the Partnership's ownership interest in SDC is referred to as Bob's ownership interest in SDC. Regardless, there is no dispute that the Partnership was the owner of a one-half interest in SDC, not Bob individually, and that any references to Bob's interest in SDC was a reference to the Partnership's ownership interest in SDC.

Under his sole point, Joe also claims the trial court's finding that he "has not proved by clear and convincing evidence ... that this mistaken belief caused Betty to amend her trust" is against the weight of the evidence. Our determination that the trial court's finding that Joe failed to prove the existence of a mistake of fact by Betty is not against the weight of the evidence, see supra , is dispositive of this appeal. The failure to prove the existence of a mistake necessarily defeats any purported causal connection to the Trust Amendment.

See note 3 for statutory text.